[Cite as *State v. Miller*, 2014-Ohio-2936.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    13 MA 12 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| DONOVAN MILLER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:         Criminal Appeal from Common Pleas
                                  Court, Case No. 11CR1085.


JUDGMENT:                         Conviction Affirmed; Remanded for
                                  Resentencing.


APPEARANCES:
For Plaintiff-Appellee:           Attorney Paul Gains
                                  Prosecuting Attorney
                                  Attorney Ralph Rivera
                                  Assistant Prosecuting Attorney
                                  21 West Boardman Street, 6th Floor
                                  Youngstown, Ohio  44503

For Defendant-Appellant:          Attorney J. Gerald Ingram
                                  7330 Market Street
                                  Youngstown, Ohio  44512


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

                                  Dated:  June 23, 2014

VUKOVICH, J.

{¶1}   Defendant-appellant Donovan Miller appeals after being convicted of aggravated murder with a firearm specification and tampering with evidence in the Mahoning County Common Pleas Court.  The threshold issue concerns suppression of appellant's videotaped statements in the interrogation room.   We find that appellant unambiguously invoked his right to cut off questioning which the police failed to scrupulously honor and thus the subsequent statements at the first interview should have been suppressed.  However, appellant later reinitiated conversation from the transport area so that his final story was properly admitted, and he retold that story to his girlfriend.  Considering that this final story (admitting that he shot the victim) was properly admitted, we conclude that it was harmless error to admit the earlier story (involving him witnessing a shooting by an unidentified intruder).

{¶2}   Appellant also raises issues involving the jury instruction for tampering with evidence, the sufficiency of the evidence to prove tampering, the jury instruction on consciousness of guilt, ineffective assistance of counsel for failing to object to the two contested jury instructions, and the imposition of consecutive sentences and post-release control.  The trial issues lack merit.  As to sentencing, the state concedes that the court failed to make consecutive sentence findings and improperly imposed five mandatory years of post-release control on the tampering with evidence conviction instead of three discretionary years of post-release control.  For the following reasons, appellant's conviction is affirmed, and the case is remanded for resentencing.

STATEMENT OF THE CASE

{¶3}   Twenty-one year old Quest Wagoner spoke to his mother on the telephone just around midnight as Thursday, September 22, 2011 was beginning.  His mother was starting her midnight shift as a nurse, and they agreed to talk the next day.  (Tr. 379).  When she could not then reach him, she went to his house at 1339 Inverness on the Southside of Youngstown just after 7:30 p.m.  (Tr. 380, 382).  She discovered the side door was unlocked, which she found unusual.  (Tr. 383).

**{¶4}** She soon discovered her son's body. (Tr. 386). He died of single gunshot wound to the head. Because she was a nurse, she knew he had not died recently as she noticed his skin was grayish/blue and his leg was cold and she felt some rigor. (Tr. 387). It appeared that he had been sleeping on his living room couch when he was shot as he was found lying on his side with one hand under his head and his legs curled up, a position his mother recognized as his favorite sleeping position. (Tr. 387-388). It was also later discovered that his eyelids had gun powder stippling but his eyes did not, meaning that his eyes were closed at the time the gun was fired.

**{¶5}** The murder weapon was not found at the scene. A loaded .9mm was found in a bedroom drawer, but it was not compatible with the .38 caliber bullet used to shoot Quest. There were no signs of a struggle in the house. The living room was neat with glass end tables and a flat screen TV intact, a can of pop sitting upright, a cigarette pack with a lighter lying square on top, and an ashtray with ashes that had not been disturbed. (Tr. 387, 398). There were no signs of forced entry at the side door, and the front door was locked. (Tr. 383, 398). In the kitchen was an open cake box with two spoons still in the cake. (Tr. 413). A marijuana grow operation was found in the attic.

**{¶6}** While police were on the scene, Quest's girlfriend, who is the mother of his child, arrived at the house. They had recently broken up, and she and the child had moved out of the house a few days prior. (Tr. 382). As police were aware the couple had past issues with domestic violence, she was placed in a police car and transported to the station for questioning. (Tr. 479-480). She was cooperative, she gave her phone to police, she offered to take a polygraph, she provided an alibi, and she consistently maintained her story. (Tr. 481). Her alibi was later confirmed by her boyfriend, whose gun was taken and excluded as the murder weapon. (Tr. 435, 468, 482).

**{¶7}** From neighbors, police learned that a green SUV-type vehicle was observed in Quest's drive at various times between 2:00 a.m. and 11:00 a.m. on the day of the shooting. (Tr. 338-341, 347-349, 353, 483-484). When police asked

Quest's ex-girlfriend about the green SUV, she related that said vehicle belonged to defendant-appellant Donovan Miller, and she provided his telephone number to police who began trying to locate him. (Tr. 485).

{¶8} Police also learned that two City of Youngstown Water Department employees were standing in the street in front of 1309 Inverness at approximately 11:00 a.m. when they heard one loud bang come from just south of their position, which testimony suggested would include the location of Quest's house. (Tr. 344, 356-358, 361-363, 370-372, 374-375). One of the employees, who had firearms training in two branches of the military, knew immediately that the bang was a single gunshot. (Tr. 365-366, 370-371). He contacted police after hearing about the shooting on the news. (Tr. 371-373). During a recorded interview, the detective asked the witness if he saw any cars driving away that day, and he responded that he saw nothing out of the ordinary. (Tr. 374-376). He testified, however, that he called the detective the next day to add that he saw a green SUV on the street; he believed the vehicle was moving. (Tr. 371-372, 374-376).

{¶9} On September 26, 2011, the detective made contact with appellant over the phone, and appellant voluntarily came to the police station for an interview. He was placed in an interrogation room where a video recorder was rolling, he was read his rights, and he signed a waiver at 11:37 a.m. Appellant stated that he and Quest were friends, noting that he helped Quest move into the rental house near his because the neighborhood was safer than where Quest had been living. Appellant said that Quest sold drugs and had been robbed twice in the past. He provided the last name of a person said to have been following Quest, adding that Quest had been shot at.

{¶10} Appellant initially claimed that he last saw Quest alive on the night of Wednesday, September 21, when Quest stopped at appellant's house on Cambridge, while appellant and his housemate were smoking marijuana. He said Quest tried to get him to come with him to look for his ex-girlfriend to see if she was with a man she had been seeing. After Quest left, appellant supposedly dropped his truck off with a mechanic named "Animal," who lived in an apartment complex on

Shields Road. Appellant's girlfriend lived in the same complex, and appellant stated that he and his housemate slept at her apartment that night.

{¶11} Appellant reported that he woke at noon on Thursday and drove his girlfriend's car to a shoe store and two auto parts stores (in order to get the parts the mechanic had written down for him). He said that he returned his girlfriend's car by 2:00 p.m. and then borrowed his mother's vehicle. He and his housemate then went to various places filming a video until Quest's ex-girlfriend called him that night to report Quest's death. Appellant said that he called Quest various times Thursday with no response and that he thought Quest was mad at him because he would not go with him the prior night. Appellant insisted that he did not see Quest on Thursday and did not get his truck back until close to midnight that night, adding that the last time his truck was at Quest's was Tuesday. He also explained that he was constantly at the house as they dealt drugs together, he often ate at the house, but he never stayed overnight.

{¶12} When the detective advised that appellant's truck was seen in Quest's drive at 2:00 a.m. and at 11:00 a.m. by neighbors with no reason to lie and asked why appellant was lying, appellant eventually revealed that after Quest left appellant's house, appellant went to Quest's house to drop off a marijuana plant and lights around 2:00 a.m., left after five minutes, and then dropped off his truck with the mechanic. When asked why he lied at first, appellant expressed that he was concerned about getting in trouble for drugs. (Although, he had already stated that he bought weed from Quest, that Quest dealt drugs, and that Quest also bought weed from him).

{¶13} The detective pressed that appellant was still lying as his car was spotted in Quest's drive again at 11:00 a.m. Appellant asked the detective to confirm his whereabouts with his housemate, and the detective advised that he would not believe the alibi of the housemate. Appellant also asked him to call his mother, who could report what time he took her car, and the detective responded that anyone's mother would try to protect their child. The detective urged him to tell the truth multiple times and expressed how he did not understand why appellant was lying

about being at the house.  Appellant then voiced that he was the last person to see Quest alive and he did not know what to do.

{¶14} Eventually, appellant admitted that he drove back to Quest's house sometime before noon.  He explained that he did not initially admit this because he came back to deliver three pounds of marijuana.  He also said he went to check on Quest, who was not answering his phone.  Appellant indicated that he left after no one answered his knock, and he returned the three pounds of marijuana to his supplier.  As to the mechanic, appellant now stated that he brought his vehicle to the mechanic after the 2:00 a.m. plant drop, the mechanic diagnosed the problem, appellant left with the vehicle, and he brought it back to the mechanic after knocking on Quest's door and returning the marijuana to his supplier.  Appellant said he used his mother's vehicle thereafter.

{¶15}  The detective pressed that this did not account for why neighbors also saw appellant's vehicle at 8:30 a.m.  The detective also fabricated that neighbors saw appellant run out of the house after hearing a single gunshot around 11:00 a.m., noting that this was the time the coroner put the time of death.  The detective then asked if appellant went in and saw Quest dead.  After pausing a moment, appellant replied that he did see Quest dead.

{¶16} Appellant's next version of events was that he entered Quest's house through the unlocked side door sometime before noon.  He said Quest was dead, lying on his side on the living room couch with a bullet in his head and blood all over his face.  He said he did not know what to do so he just ran.  He added that he saw people outside when he ran out of the house, specifically he saw the people across the street to the right and other people to the left.  He said that he originally lied because of the three pounds of marijuana and he was scared due to Quest's drug business, fearing "they" would kill him next.  He denied being present when the gun was fired.

{¶17} The detective asked what happened inside the house, stating that he could not believe that appellant would walk up and shoot Quest in the head.  He asked for motive:  was Quest hurting his girlfriend; was there a fight over drug

money; was Quest threatening him; did he shoot Quest for someone else; or did he see someone else shoot Quest? The detective and a captain explained that appellant was in serious trouble and about to be indicted for murder. In discussing the unlocked side door, appellant stated that it was always unlocked and the detective responded that it was unlikely Quest would leave his door unlocked if he was afraid of people following him, had been robbed twice, and had marijuana growing in the attic.

{¶18} Appellant put his head down or laid his head on his arm while the officers talked. He announced that he did not murder Quest. Then, at 1:25 p.m. on the video, appellant stated multiple times, "I'm done talking," but the discussion did not cease. (A detailed description of what occurred here is set forth in the suppression assignment below.) Thereafter, at 1:35 on the video, appellant was asked if someone else was inside the house. Appellant stated multiple times that he was "gonna get killed," and he asked for protective custody, while the police told him to think about himself and asked what he saw. He seemingly began crying and reported that, when he arrived at Quest's house, he saw a man holding a black gun, who took the three pounds of marijuana and appellant's identification, said he knew where appellant lived, and threatened to kill him if he told the police. He described the shooter as being white or Puerto Rican, with black hair and tattoos, 6' tall, and weighing less than 200 pounds. Appellant denied hearing a gunshot.

{¶19} Then, he admitted that he did hear the gunshot as he walked through the kitchen to the living room. He repeated the prior story and said he ran out when instructed to by the shooter, adding that this was when the neighbors saw him. The officers expressed that the shooter would not have let appellant go and this would not explain why his car was there at 8:30 a.m. as well.

{¶20} Appellant then altered the story, admitting that he spent the night at Quest's house. He stated that the above-described man knocked on the side door, put a gun to his head when he answered, searched him, took his identification, and walked him to the living room where Quest was sleeping. Appellant disclosed that the man asked appellant where the money was, took $500-600 in cash that appellant

had sitting by the TV and the three pounds of marijuana, and asked for the rest of the money. Appellant related that the man said, "you think I'm playing?" and then shot Quest as he slept. Appellant maintained that the man threatened him and let him run out of the house. He explained that he and Quest were going to buy the marijuana for $1,100 per pound (or $1,250 per pound if they did not buy all three pounds).

{¶21} When appellant was accused of covering for himself, he pulled his shirt over his head and put his head on the table and said, "I'm done talking" multiple times as officers continued to talk. (This discussion is set forth in more detail in the suppression assignment.) The detective expressed that the story did not make sense and said appellant could get the shooter locked up for life. Appellant replied that he did not know him but would testify against him. They discussed a photo line-up and the characteristics of the alleged shooter. Appellant fretted that word would spread that he was a snitch and he would be killed. When asked about the gun, appellant disclosed that it was a long-barreled, revolver. While they were going over a map of Quest's house, DVD 1 ended at 2:32 p.m. (as it only holds three hours of content).

{¶22} At some point, appellant was brought upstairs to the holding cells in the police station for transport to the county jail. The detective stated that when he brought the transport papers to the holding cell later, appellant said he wanted to tell the truth. Around 4:00 p.m. on DVD 2, he was brought back to the interview room and re-*Mirandized* Appellant disclosed that he spent the night at Quest's house and left in the morning to pick up marijuana. He revealed that when he returned to Quest's house, Quest did not want to purchase the marijuana and they started to fight. Appellant asserted that Quest kicked him between the legs and pulled out a gun.

{¶23} Appellant said they wrestled for the gun, he wrested it from Quest, and when he went to hit Quest with the gun, it went off as Quest already had it cocked. Appellant then ran and could not remember where he dropped the gun, noting that he searched his truck for it later. He advised that he also told his housemate that Quest tried to rob him, they fought, and the gun went off on accident. He reverted to

the story that he returned the marijuana to his supplier (which he had more recently stated was stolen by the unidentified shooter). Appellant stated that he drove by Quest's house hours later because he did not know if Quest was dead or if maybe the bullet just grazed him. He also disclosed that he once had an issue with Quest over drug money but said he had let the issue go.

{¶24} Appellant's girlfriend was then permitted into the interrogation room to say goodbye. While the video was still recording onto DVD 3, appellant reiterated to his girlfriend that he accidentally killed Quest while defending himself. He stated that he did not do it intentionally, Quest pulled a gun on him and tried to rob him, he got the gun off Quest during a fight, he did not know Quest already had the gun cocked back, and the gun just went off. He said the police gave him one more chance because his story did not make sense so he told the truth. He mentioned that he would have to serve some time in prison.

{¶25} Appellant was then indicted for aggravated murder with a firearm specification (as the evidence showed the victim had been sleeping), tampering with evidence (as he disposed of the murder weapon), and trafficking in marijuana (as he said he was there to sell three pounds of marijuana). He filed a motion to suppress his statements, contending in pertinent part that the police failed to cease the interrogation when he stated that he was done talking at 1:25 p.m. and all the times thereafter until the first video stopped at 2:32 p.m. It was also alleged that the re-*Mirandization* that occurred at 4:07 p.m. could not cure the prior violation (to allow the statements made thereafter) as substantial time must pass before initiation of conversation could be reattempted.

{¶26} The state countered that appellant did not unambiguously invoke his right to remain silent when he said he was done talking. The state urged that each time appellant claimed to be done talking, he kept talking. The state also said that sufficient time elapsed between the interviews and it was appellant who asked to speak with the detective again. The state also pointed out the first four stories appellant told occurred before the alleged invocation and they were thus not subject to the Fifth Amendment argument. At the suppression hearing, the detective testified

that he did not interpret appellant's statements as invoking the right to remain silent because appellant kept answering after saying he was done talking and because his statements were the result of frustration and confusion because he was making up stories and did not know what else to say. (Supp.Tr. 30-38, 55).

{¶27} The trial court watched the recordings and overruled the motion to suppress. The court found that although the defendant stated that he was done talking, his words and actions showed that he did not want to remain silent as he kept talking and asking questions. The court concluded that a reasonable officer would not view any invocation as unambiguous and found the entire first interview admissible. The court alternatively stated that even if he invoked silence at the first interview, he reinitiated the interview while awaiting transport so that the second interview on DVD 2 was admissible. The court also found that DVD 3, containing appellant's retelling of the self-defense story to his girlfriend, was also admissible.

{¶28} The case was then tried to a jury. The state presented the testimony of the two neighbors, the two water department employees, the victim's mother, the first responding officer, and the BCI forensic scientist who examined the bullet recovered from the victim. Then, photographs of the scene and appellant's vehicle were introduced by a crime scene officer. He testified that a gunshot residue (GSR) test was conducted on the victim, on appellant's vehicle, and on Quest Wagoner's ex-girlfriend. (Tr. 419, 432, 443). He submitted a pair of shoes for testing which he found in the recycle bin behind appellant's residence and another pair which were taken from appellant at the station. (Tr. 421, 424, 489, 522). In searching appellant's vehicle, he found appellant's driver's license in plain view in the visor and $670 cash and a small amount of marijuana in the console. (Tr. 426-428, 430).

{¶29} The forensic pathologist testified that the victim was shot in the center of the forehead with a gun held eight to twelve inches from the victim. (Tr. 572-573). The bullet was recovered from behind the right ear. (Tr. 557). There were no defensive wounds. The pathologist pointed out there were gun powder burns on the face and eyelids but not on the eyes themselves. (Tr. 554-555). He concluded that this and the body's position were consistent with a sleeping victim. (Tr. 574-575).

His time of death was said to be "near noon," with a range in the surrounding hours. (Tr. 577).

{¶30} The detective testified about the scene and how there was no evidence of a fight, referring to the condition of the room and the position of the victim's body and clothing. (Tr. 475, 504). He explained that there were no shell casings at the scene. (Tr. 475). He stated that he excluded Quest's ex-girlfriend and her boyfriend as suspects. (Tr. 480-488). He acknowledged that the GSR tests for the victim and for his ex-girlfriend came back positive. (Tr. 531). He pointed out that GSR generally lasts for four hours but the victim's girlfriend was tested nearly twelve hours after the shooting, noting that she had been placed in the cruiser and some studies show that GSR can be picked up that way; it was also noted that people placed in cruisers are often handcuffed and officers often have GSR on their hands. (Tr. 479, 538). The GSR test for appellant's vehicle was never submitted due to prior rejection of such tests by BCI in the past. (Tr. 489-490). The detective noted that appellant disclosed that the weapon was a revolver, and that at the time of the interview, the detective did not know that a .38 caliber bullet was used, which he said is only shot from a revolver. (Tr. 545). Appellant's recorded statements were played for the jury. (Tr. 491-501).

{¶31} The defense presented the testimony of a BCI scientist who testified that the GSR test came back positive from one of the victim's hands and there was only one particle found on each of the ex-girlfriend's hands. (Tr. 595, 601). He stated that after four to six hours of normal activity, even without washing, GSR is usually eliminated. (Tr. 598-600). It was noted that the ex-girlfriend was tested more than ten hours after the shooting. The defense also called a BCI scientist who found no trace of blood on either the pair of shoes that appellant threw away or the new pair that he bought the day of the murder. (Tr. 610). She explained that blood can be cleaned from shoes so that it would not appear in her testing. (Tr. 611).

{¶32} Next, an employee from AutoZone (on Market Street on Youngstown's Southside) produced a receipt from 11:55 a.m. on the day of the murder showing that ball joints were purchased with cash for a 1995 Chevy Tahoe. (Tr. 616). The

warranty portion of the receipt named the owner as Donavan (misspelled) Miller. (Tr. 617). He explained that many customers are mechanics buying parts for customers and that a mechanic would put the customer's name on the warranty. (Tr. 620).

{¶33} An employee of Youngstown Auto Wrecking (on the Eastside, close to downtown) produced a receipt from 12:04 p.m. on the day of the murder showing that a brake booster was purchased for a 1995 Tahoe naming the owner as Donavan (same misspelling) Miller. (Tr. 646-647). She believed the salesperson would have used the name of the person in the store. (Tr. 650). Another employee testified that he was the salesperson on the receipt. He said it appeared the part had to be removed from a vehicle in the yard so the purchaser would have had to return the next day. (Tr. 654-656). He believed that he had seen appellant before. (Tr. 654-655).

{¶34} Appellant's mother testified that appellant came over to borrow her vehicle at 11:00 a.m. on the day of the murder. (Tr. 624). She said he left with her car after visiting for ten minutes. (Tr. 625). Another witness testified that appellant came to see her boyfriend at their apartment in Liberty at 10:30 a.m. but left after fifteen minutes as her boyfriend was not home. (Tr. 632-633). She testified that appellant returned between 12:45 p.m. and 1:00 p.m. and stayed for forty-five minutes. On cross-examination, the state asked if she was certain the date was September 22. She said she was because that was the date her boyfriend went to court for a traffic ticket. (Tr. 636). The state then showed her certified records from Trumbull County showing that her boyfriend had an appearance date on September 21. (Tr. 637-638). On redirect, she stated that her boyfriend went to Warren Municipal Court, and she did not know if he had to go two days in a row. (Tr. 639).

{¶35} Her boyfriend testified that appellant came over at 12:00 or 12:30 p.m. on September 22 for half an hour. (Tr. 641-642). He stated that he had been in traffic court that day in Warren for a follow-up but had not been in traffic court the day before. (Tr. 641). In closing, defense counsel noted that the paperwork produced by the state involved a court in Girard rather than Warren. (Tr. 688).

**{¶36}** For Quest's death, the jury was instructed on both aggravated murder and murder. They found appellant guilty of aggravated murder with a firearm specification and tampering with evidence and found him not guilty of drug trafficking. In a February 4, 2013 entry, the court sentenced appellant to thirty years to life, plus three years for the firearm specification, with a consecutive three-year sentence for tampering with evidence. The court also imposed a five-year mandatory term of post-release control.

ASSIGNMENT OF ERROR NUMBER FIVE

**{¶37}** Appellant's suppression argument has been relocated here as it is a threshold issue and here it is in closer proximity to the recitation of the facts pertinent to suppression:

**{¶38}** "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS STATEMENTS."

**{¶39}** Appellant states that he invoked his right to remain silent multiple times during the interview but the police failed to scrupulously honor his right and thus the statements made after his invocation should be suppressed, citing principles derived from the United States Supreme Court cases of *Michigan v. Mosley*, *Smith v. Illinois,* and *Edwards v. Arizona*. He acknowledges that interrogation can continue if the defendant initiates further exchanges but urges that the officer's statements encouraging him to continue talking after his invocation were the equivalent of further interrogation. He also states that the second interview and the subsequent conversation with his girlfriend were the direct results of the Fifth Amendment violations during the first interview and must be suppressed as fruits of the poisonous tree.

**{¶40}** The state counters that appellant's alleged invocation statements were ambiguous as appellant did not sufficiently articulate his desire to cut off questioning clearly so that a reasonable police officer under the circumstances of the case would understand his statements to be the invocation of his right to remain silent. The state notes that the officers have no duty to try to clear up any ambiguity in his alleged

invocation. The state cites examples from the Ohio Supreme Court in *Murphy* and *Jackson* and appellate courts in *Bird* and *Wright*.

**{¶41}** The *Miranda* warnings protect the Fifth Amendment constitutional privilege against compulsory self-incrimination by excluding the product of custodial interrogation unless the defendant is informed that he had the right to remain silent, any statement can be used against him as evidence, he has the right to an attorney, and one will be appointed for him if he cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The opportunity to exercise these rights exists throughout the interrogation, and thus, the interrogation must cease when the defendant exercises his "right to cut off questioning," which must be scrupulously honored. *Id.* at 473-474, 479. *See also Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 327, 46 L.Ed.2d 313 (1975).

**{¶42}** In *Mosley*, the Court pointed out that invocation of the right to cut off questioning does not create a per se proscription on later questioning. *Mosley,* 423 U.S. at 102-103 (where detective stopped questioning immediately upon exercise of right and other detective re-*Mirandized* him two hours later at other location and questioned him about other crime). The Court stated that admissibility of statements obtained after the person in custody has invoked the right to remain silent depends on whether his right to cut off questioning was "scrupulously honored." *Id.* at 104. The Court suggested that the right is not honored "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-106.

**{¶43}** Recently, the Supreme Court clarified that once a defendant waives his right to remain silent, the subsequent assertion of the right during the interview must be unambiguous in order to require the police to stop. *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (there is no reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel in *Davis*), citing *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (which held that the

*Miranda* right to counsel must be unambiguously invoked before immediate cessation of questioning was required). The *Berghuis* Court stated that the requirement of unambiguous invocation of *Miranda* rights allows objective inquiry in order to avoid the "difficulties" in proof and provide guidance to officers so they need not make difficult decisions on unclear intent of defendants. *Berghuis*, 560 U.S. at 381-382 (and officers need not ask clarifying questions where invocation is ambiguous or equivocal).

**{¶44}** In a right to counsel case, it has been stated that the court can view the statement and the events leading up to it but cannot view subsequent statements to determine if the invocation of the *Miranda* right was ambiguous, as there is either an assertion of the right or not at the time of the alleged invocation. *Smith v. Illinois*, 469 U.S. 91, 97-98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). It was pointed out that the invocation of the right and the subsequent waiver of the right are distinct issues which are not to be merged or blurred. *Id.* at 98.

**{¶45}** Nevertheless, a defendant can himself reinitiate further conversation after invoking a *Miranda* right. *See Edwards v. Arizona*, 451 U.S. 477, 485-486, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (invalidating police-initiated second interview after defendant invoked right to counsel but had not yet received counsel but noting that the interview would have been permissible had the defendant initiated the further conversation). *See also Arizona v. Robertson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 74 (1988) (saying that subsequent suspect-initiated exchanges were "perfectly valid" after invocation of *Miranda* right to counsel).

**{¶46}** Thus, we must first determine whether the defendant unambiguously invoked his right to cut off questioning at various points and whether the police failed to honor that request so that the resulting unidentified shooter story must be suppressed. We must then determine whether the defendant reinitiated conversation in a separate setting, permitting the admission of the subsequent story of accidental firing during self-defense.

**{¶47}** In *Berghuis*, the defendant was largely silent throughout the hours of interview but did not make any statements regarding his wish to cut off questioning.

The Court noted that the defendant "did not say that he wanted to remain silent or that he did not want to talk with the police" and described these options as simple, unambiguous statements that would have invoked the right to cut off questioning. *Berghuis*, 560 U.S. at 382.

**{¶48}** The Ohio Supreme Court has stated that the defendant must articulate the desire to cut off questioning sufficiently clearly so that a reasonable police officer under the circumstances would understand the statement to be an invocation of the right to remain silent   *State v. Murphy*, 91 Ohio St.3d 516, 520, 747 N.E.2d 765 (2001) (applying *Davis* to the right to cut off questioning prior to *Berghuis*).   In *Murphy*, the defendant told his version of events and concluded, "I'm ready to quit talking now and I'm ready to go home, too."  The Court stated that the first part of the sentence might well be read as an unambiguous invocation if read in isolation but the words must be read in context.  *Id.* at 520-521.  The Court concluded that the statement could be interpreted as merely meaning that he wanted to "go home" and his words did not mean that he wanted to stop talking no matter what because if police were not ready to release him, he may have wanted to keep talking.  *Id.* at 521.  Thus, *Murphy* concluded that the statement was ambiguous and police were not required to clarify or to cease questioning.  *Id.* at 520-521.  That defendant's statement was an unprovoked concluding statement to a flowing rendition of his version of events.

**{¶49}** In *Jackson*, the defendant said, "I don't even like talking about it man * * * cause you know what I mean, it's fucked for me, man, * * * I told you * * * what happened, man, * * * I mean, I don't even want to, you know what I'm saying, discuss no more about it, man, you know, 'cause it ain't gonna, you know, it ain't gonna to bring, ain't gonna bring the man back."  *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 97.  The Court seemed to find this equivocal, as it upheld the introduction of the subsequent statement, "I ain't mean to do it, I'm sorry I did it, * * * but, I was left, I had no choice, man."  *Id.* at ¶ 98.

**{¶50}** After this, the defendant stated, "I don't even want to talk about it no more, man. I'm, I'm, I'm through with it, man," and soon added, "And that's it. End of

discussion, man." The Court concluded that the police should have stopped questioning at that point. *Id.* at ¶ 99. The Court found harmless error, however, because the statements made after the invocation did not add substance or implicate him further. *Id.*

**{¶51}** In the *Wright* case cited by the state, the defendant stated: "Yeah, yeah. You know, man, I really don't even want to keep going through these questions and stuff, man, because you all getting ready to charge me with something. I don't know, man. You know what I am saying?" *State v. Wright*, 10th Dist. No. 07AP-154, 2007-Ohio-7144, ¶ 36. The detective merely asked, "You don't want to answer any more questions?" The defendant replied, "At least tell me what I am charged with, man." The officer urged him to tell his side, stating his odds of being charged were 100%. *Id.* The Tenth District stated that the defendant did not clearly or unequivocally assert his right to remain silent because he qualified the invocation with, "I don't know, man. You know what I'm saying?" *Id.* at ¶ 38, 41. Plus, the detective's initial response was clarifying, not interrogation, and then appellant kept talking. *Id.* at ¶ 41, 43.

**{¶52}** The court then addressed the statement: "if it is like that, man, I ain't got nothing to say, man. I ain't got nothing to say. I ain't got nothing to say. Evidently, you're trying to put something on me, man. I ain't got nothing to say. I didn't-I didn't do nothing. I ain't did a thing. I ain't did a thing. I ain't did a thing. I ain't did a thing." The detective did not try to elicit further comments except to respond, "Okay. So you don't want to talk about this anymore?" The defendant replied: "No, not if you're trying to put something on me. You still ain't told me what I did, you know what I'm saying. And I am still answering your questions. You know what I'm saying?" *Id.* at ¶ 37. The court pointed out that appellant answered the clarifying question by stating that he was still answering. *Id.* at ¶ 38, 41, 43.

**{¶53}** At another point, the defendant said, "I don't even know nothing. So, I mean, I really-really have nothing else to say, man. I really don't." The detective asked if appellant had any questions for him. *Id.* at ¶ 39. Appellant asked what the case was about. The detective gave some specifics, and again asked if the

defendant had any other questions. Appellant repeated his version and repeatedly denied that he did anything. *Id.* at ¶ 40. The court did not really address this portion of the interview except to say that the follow-up questions were not interrogation. *Id.* at ¶ 43.

**{¶54}** In the *Bird* case cited by the state, a detective told the defendant that this was his chance to talk about it, noting that he had been talking to other people. *State v. Bird*, 12th Dist. No. CA2002-05-106, 2003-Ohio-2541, ¶ 28. The defendant replied, "Everything's right there in the paper [possibly referring to a list of witnesses who told police what appellant told them about a murder]. I'm done talking about it." *Id.* The appellate court stated that after viewing the video and considering the context of the statement, the defendant did not express an unequivocal desire to end the questioning and remain silent. *Id.* at ¶ 30-31 (earlier defendant stood up and said to book him as there was no sense sitting there and trying to convince them). These two appellate cases cited by the state are not binding and not directly on point.

**{¶55}** In the case before us, after nearly two hours of questioning, when the police were beginning to accuse appellant of the murder, appellant put his head down or laid his head on his arm while the officers talked. He said that he did not murder Quest. The detective stated that it was hard to believe and asserted that appellant was in the house at the time of the gunshot. Appellant then recapped his last story and said, "How is that hard to believe?"

**{¶56}** As the captain was responding, at 1:25 on the video, appellant then stated with his head down in his arm, "**I'm done talking**" three times and then lifted his head. The detective stated that it is not going away and asked if appellant wanted some water. Appellant responded, **"I'm just done talking. There's nothing else to talk about."** The detective told him to relax, to sit there for a minute, and said, "**We're gonna talk**." The detective asked if he wanted water again, and appellant answered affirmatively.

**{¶57}** When the detective left the room, the captain stated, "**Believe me, you're not done talking** cause what's gonna happen is, you'll probably get indicted,

you'll get a lawyer assigned to you."  Appellant asked if he was going to jail, and the captain responded that he would have to see what the detective wanted to do.

**{¶58}** Appellant then stated twice, "**I ain't got nothing else to say**."  He added, "**I keep getting asked the same questions.  I ain't got nothing else to say.  I want to go home or go to work.  I just ain't got nothing else to say**."  The captain replied, "Well then we'll do what we gotta do."  He added they gave him every opportunity to explain so he should have "no hard feelings" later.  Appellant then stated, "I just wanna go.  I should have never dealt with drugs and I wouldn't be in this predicament."  The captain agreed and expressed that this was not going away. He reiterated, "don't hold it against us because we gave you every opportunity to tell us what happened."  He also stated, "Now you do what you want.  The ball's in your court."

**{¶59}** Appellant replied, at 1:28 on the video, "**I'm done talking.  I just wanna go**."  The captain said he would see what the detective wanted to do, adding, "He'll probably want to cut you loose and then go talk to the prosecutor to get the warrant."  Appellant repeated, "Get a warrant?"  The captain asked if appellant had provided his contact information and then asked appellant about his job.  The captain left to retrieve the detective at 1:29.  Appellant began pacing.  When they returned at 1:32, the detective provided him with water, and the captain cuffed appellant's leg to the floor.  The detective explained that they "did not have a choice but to lock you up on this.  It's just too compelling."  He then said he wished appellant would tell him what this was all about, asking if someone put him up to it or someone else was there or there was a fight involved, stating, "Donovan, **you gotta come off right about this**."  Appellant stated, "**I told you everything I know.  There ain't nothing else to talk about**."

**{¶60}  The detective kept talking**.  Appellant again stated, "**There's nothing else to talk about**."  **The captain then asked if appellant wanted to talk about** Quest's ex-girlfriend, and appellant asked what about her.  Soon, he told three versions of the unidentified shooter story:  (1) he walked in after the shooting without hearing a gunshot; (2) he heard the gunshot as he walked in; and (3) he stayed the

night at Quest's, he answered the door to find the shooter, and the shooter walked him to the living room and shot Quest while asking appellant for money.

**{¶61}** The United States Supreme Court's *Berghuis* case described an expression that "he wanted to remain silent *or that he did not want to talk with the police*," as a simple, unambiguous statement that invokes the right to cut off questioning. *Berghuis*, 560 U.S. at 382 (emphasis added). Appellant's statement to the two police officers, "I'm done talking," is a simple statement that he did not want to talk to the police. Ambiguity in the statement itself is wholly lacking. See *Murphy*, 91 Ohio St.3d at 520 (stating that, "I'm ready to quit talking" by itself would be unambiguous).

**{¶62}** And, appellant initially repeated the statement three times in a row. Moreover, nothing occurred prior to that statement or was attached to that statement to make it ambiguous. *Compare Murphy*, 91 Ohio St.3d at 520-521 (where suspect told his story and concluded by saying he was done talking and ready to go home*). See also Smith v. Illinois*, 469 U.S. at 97-98 (court can view the statement and the events leading up to it but cannot view subsequent statements to determine if the invocation of the *Miranda* right to counsel was ambiguous, as there is either an assertion of the right or not at the time of the alleged invocation).

**{¶63}** And, appellant soon followed his litany with, "I'm just done talking. There's nothing else to talk about." See *Jackson,* 107 Ohio St.3d 300 at ¶ 99 (police should have stopped after, "I don't even want to talk about it no more, man. And, that's it. End of discussion."). Appellant continued to make further declarations thereafter, which only served to reinforce the initial invocation. Contrary to the state's position, appellant's subsequent mentioning that he wanted to go home or to work would not erase a prior invocation merely because the *Murphy* court held that a single, compound statement, "I'm done talking and I want to go home, too" was ambiguous. We are not faced with one compound statement used as the suspect was wrapping up his version of events.

**{¶64}** The unambiguous statements here had already occurred with the use of the "simple" statement approved of in *Berghuis* and repeated by appellant multiple

times. The statements were made in response to hard questioning, not at the tail end of a defendant telling his story, and they were not connected to a further phrase that may have diminished the unambiguous nature of the invocation. *Compare Murphy*, 91 Ohio St.3d at 520-521. We thus conclude that appellant clearly invoked his right to cut off questioning at and after the 1:25 announcement, "I'm done talking."

**{¶65}** A detective not only ignored a clear invocation of the right to remain silent, but interrupted it and tried to talk over it. And, the detective and the captain actually instructed that he was not done talking. A detective cannot erase the invocation by leaving the room, while another officer keeps engaging the defendant, expressly reinforcing the other officer's assertion that appellant was not done talking, and then returning within minutes and essentially telling the defendant that he has to say something. Their express declarations constituted an announcement that he could not invoke his right to cut off questioning.

**{¶66}** Moreover, merely because an officer ignores the invocation, keeps talking, and is able to prompt further statements within minutes from the defendant does not mean the prior invocation is ambiguous or a new waiver is entered. As per *Miranda* and *Mosley*, when the suspect invokes right to silence, the direct or indirect interrogation must cease. *See Mosley,* 423 U.S. at 105-106 (the right to cut off questioning is not honored "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."). Persistent attempts to prompt the defendant to speak after his invocation are just as improper as specific questioning. *See id.* at 105-106. *See also Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (if suspect invokes *Miranda* right to stop speaking without counsel, questioning must stop; waiver is not established by the fact that he kept responding to police-initiated conversation).

**{¶67}** In sum, the officers expressly declined appellant's request to be done talking. The officers repeatedly prompted him to continue speaking and then questioned him further. His request was not scrupulously honored. The fact that he

answered various statements and eventually told a new story does not erase his prior invocation or eliminate the fact that police did not honor that invocation, i.e. there was no respite and reinitiation by the defendant prior to the three versions of the unidentified shooter story. As a result, the three versions of the unidentified shooter story should have been suppressed.

**{¶68}** We also point out here that after appellant told the unidentified shooter story, appellant pulled his shirt over his head and put his head on the table. (DVD 1 at 2:04 p.m.). He then said, "I'm done talking" nine times in a row as officers continued to talk. Then, the detective stated, "You're done talking, but it ain't gonna go away. It doesn't make any sense, man." The detective continued talking and prompting appellant to talk. Thus, appellant's right to cut off questioning was violated again. The statements made after this violation are similar to those appellant made after the first violation.

**{¶69}** We proceed to address whether the admission of the unidentified shooter story was harmless. Notably, appellant's invocation of his right to cut off questioning came after he had already told the police the following various stories that changed each time the flaws in his story were identified: (1) he last saw Quest Wednesday night when Quest stopped over; he dropped his truck off at a mechanic's near midnight; he slept at his girlfriend's house with his housemate; he borrowed her car and then his mother's car the next day while running to various places; his truck was last at Quest's on Tuesday; he never stayed overnight at Quest's; (2) he went to Quest's at 2:00 a.m. to drop off marijuana plants and lights, left after five minutes, dropped his truck off with the mechanic, and slept at his girlfriend's with his housemate; (3) the mechanic only diagnosed the problem that night after he dropped a plant off at Quest's house and appellant then drove his truck from the mechanic's place; he drove back to Quest's house before noon on Thursday to deliver three pounds of marijuana; he knocked on the door but no one answered; he returned the three pounds of marijuana to his supplier, returned his truck to the mechanic, and borrowed his mother's car; and (4) appellant entered through the unlocked side door before noon on Thursday; he claimed the door was always unlocked even though he

said people were after Quest, who sold and grew marijuana; he saw Quest lying on his side, dead from a gunshot wound to the head with blood all over his face; and he ran from the scene seeing people in the neighborhood as he fled in his green Tahoe.

**{¶70}** The state's evidence to be considered here also includes that:  there were no signs of forced entry; the victim was shot from close range while sleeping; appellant's vehicle was seen at Quest's house by two witnesses at approximately 2:00 a.m., 8:30 a.m., 10:15 a.m. and 11:00 a.m.; appellant told multiple stories; he lied to police and concocted an alibi for his truck; it was unlikely Quest would have left his door unlocked, but appellant stated he entered through an unlocked door; and he fled the scene upon seeing his friend's condition and did not call for an ambulance or police all day long.

**{¶71}** Lastly, there is appellant's final story that the gun accidentally fired at Quest's head while appellant was trying to hit him with the gun in self-defense after allegedly disarming Quest who was trying to rob him of the three pounds of marijuana that appellant brought over to sell to him.  And, there is appellant's subsequent retelling of this self-defense/accidental firing story to his girlfriend.  With this story admitted (which issue is analyzed next), we conclude that the unidentified shooter story was harmless beyond a reasonable doubt.

**{¶72}** We observe that the admission of the unidentified shooter story may have reinforced that appellant told many lies to police, but appellant's admissible stories already demonstrated that he was in the midst of multiples lies on the topic of the day of the shooting.  The admission of unidentified shooter may have actually help show that appellant was really afraid of a shooter and that was why he changed his story to self-defense after initially "snitch[ing]" on someone else.  That is, the final self-defense/accidental firing story was not believable as the victim appeared to have been sleeping when shot and his clothes were straight and the room was not out of place.  Likewise, the defense did not rely on the self-defense story but suggested that his initial statement to police, involving various alibis,[1] was true and the police led

---

[1]As to his alibi defense, appellant's mother testified that he came to her house to borrow her car at 11:00 a.m. on the day of the shooting and stayed for ten minutes.  He presented receipts from

appellant through his various lies. In fact, if all the other stories were coming in, appellant may not have protested the admission of the unidentified shooter story below. And, his argument on appeal is geared toward excluding all statements made after the 1:25 invocation of the right to cut off questioning. The admission of the unidentified shooter story would not prejudice the defense if the accidental shooting during self-defense story was properly admitted.

**{¶73}** This leads to the next question: must appellant's subsequent story on accidental firing during self-defense be excluded as the "fruit" of the prior *Miranda* violation. To recap, appellant invoked his right to cut off questioning at 1:25 p.m. and then told his unidentified shooter story from 1:35 until 2:04, at which point he again invoked his right to cut off questioning. Thereafter, he restated the story, was encouraged to describe the shooters' characteristics for a line-up, and the DVD ended at 2:32 p.m. with appellant and the detective going over the layout of Quest's house on a map. At some point, officers from the jail unit came down to the interview room, handcuffed appellant, and brought him upstairs to the jail unit to await transport to the county jail. (Supp.Tr. 39-40).

**{¶74}** DVD 2 begins at 4:07 p.m. with the detective reading appellant's *Miranda* rights again and appellant signing the waiver. Appellant noted that the detective said he could help him and asked how the detective could help him with this. The detective stated that appellant pulled him aside upstairs to tell him the truth and he wanted him to go through it again. Appellant stated that he was scared and then told the story of accidental firing during self-defense (set forth in statement of facts).

**{¶75}** After the story, another detective in the room made some comments, and appellant explained that he was scared and did not know what to do, stating, "Luckily, this man [gesturing to the main detective] gave me one more chance when he was upstairs. So I'm just like fuck it, tell him the truth 'cause he kept asking, and

---

parts stores for just before noon and just after noon. His friend testified that he was at his house around 12:30, and the friend's girlfriend testified that appellant stopped over earlier around 10:30 as well.

like he said, he's not the drug police [which was something they discussed repeatedly during the admissible portions of the original interview]." On video, the detective clarified that when he came upstairs, appellant asked about the charges, the detective answered, appellant freely stated that he wanted to talk about what had happened, appellant went ahead and told the story, and the detective told him that they would go downstairs to talk further. Appellant agreed that this was the sequence of events.

{¶76} At the suppression hearing, the detective testified that after the officers transported appellant upstairs, he stayed downstairs and completed his paperwork for transfer, including preparation of the charges. He stated that he brought the paperwork to the jail unit so appellant could be transported to the county jail. (Supp.Tr. 40). He testified that appellant was sitting waiting for transfer and he "immediately jumped up and said that he wanted to talk to me about this homicide, he wanted to tell me the truth." (Supp.Tr. 40-41). He listened and then told appellant they would have to go downstairs to sit and talk about it. (Supp.Tr. 41).

{¶77} On cross-examination, the detective was asked about his notes from the interview, with a focus on the conversation upstairs. (Supp.Tr. 49). The page referred to by defense counsel provided that the detective delivered the paperwork to the transporting officers at which time appellant asked what he was being charged with and why he was being taken to county jail, the detective responded that he was being charged with the murder of Quest Wagoner, and appellant requested to talk to the detective and tell the truth about the homicide. *See* State's Exhibit 1 at 7, 9.

{¶78} Appellant argues that DVD 2 (containing the accidental firing during self-defense story) and DVD 3 (repeating the story to his girlfriend) should be suppressed under the fruit of the poisonous tree doctrine, generally citing *Wong Sun* and *Mapp*. That is, he urges that the final story represented the fruit of the unheeded *Miranda* invocation and the inadmissible unidentified shooter story told during the last hour of the three-hour interview on DVD 1.

{¶79} In *Wong Sun*, the Court held a statement of a defendant made in his bedroom just after police unlawfully broke down his door to unlawfully arrest him in

his house "derives so immediately" from the official illegality that it was an excludable fruit and that there was no time for an intervening independent act of a free will to purge any taint. *Wong Sun v. United States*, 371 U.S. 471, 584, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (simply extending the exclusionary rule to the states). Here, the final story had no real nexus with the story subject to suppression for violation of the right to cut off questioning, and appellant was not being illegally detained.

**{¶80}** It has been stated that the second story (after police reinitiation) need not be automatically suppressed as a fruit merely because the first story must be suppressed *due to the failure to give any warnings*; rather, the court views the voluntariness of the first and then the second stories. *Oregon v. Elstad*, 470 U.S. 298, 311-312, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042 (where police purposely withheld *Miranda* warnings at session II because suspect invoked his rights at session I, session II was then suppressed, but session III was found admissible). Voluntariness is not raised here.[2]

**{¶81}** Yet, those cases involved failure to initially warn rather than failure to cease after the invocation of the right; so they do not involve the *Mosley* test inquiring whether the police scrupulously honored the right to cut off questioning test. To reiterate, *Mosley* held that the admissibility of statements made after a person in custody has invoked his right to silence depends on whether the police scrupulously honored the suspect's right to cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Still, *Mosley* dealt with police

---

[2]DVD 2 shows no indication of impropriety or even of pressure. Appellant acted relieved to be telling his story. He even stood up and reenacted the maneuvers he allegedly used to disarm the victim and mimed the action of beginning to hit the victim with the gun as it went off.

As for the last hour of DVD 1, there may be a violation of the right to cut-off questioning requiring suppression, but there is no palpable coercion in the conversation and there is no mistreatment. Repeatedly urging a suspect to tell the truth and providing guesses as to what happened are not coercive police tactics; nor is saying you want to help him or giving a false sense of security. *See Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns"). And, such question of voluntariness is best left for the trial court.

reinterrogating the suspect later after he had invoked his right to cut-off questioning and did not deal with a suspect's later initiation of communications. *Mosley,* 423 U.S. at 102-104 (admitting statement where a different officer re-*Mirandized* and questioned suspect at different location on a different offense two hours after first interview). A defendant asking to speak to police after they violated his right to cut off questioning is a somewhat different scenario from pure police reinterrogation after violating his right.

{¶82} In general, a suspect can waive previously asserted *Miranda* rights and ask to speak with officers and reinitiate conversation. *See State v. Davies*, 80 Ohio St.3d 311, 320 686 N.E.2d 245 (1997) (but where police had previously honored his invoked right to stop talking), citing *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The main holding in *Edwards* was that when a suspect invokes his right to counsel, questioning must stop and waiver cannot be established by showing that he kept responding to police-initiated conversation. The Court added:

> "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. * * *

> "In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial."

*Edwards*, 451 U.S. at 484-485. *See also Arizona v. Robertson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 74 (1988) (further suspect-initiated exchanges are "perfectly valid" after invocation of *Miranda* right to counsel); *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

**{¶83}** The *Edwards* Court also observed that where the meeting is initiated by the accused, it is likely that the officers will say something that would clearly constitute an interrogation. *Edwards*, 451 U.S. at 486, fn. 9. "In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.*

**{¶84}** Some courts interpret all this to mean that the suspect's subsequent initiation and waiver of previously invoked rights depend on the police having previously honored the suspect's invocation, finding that the police violation after invocation suggests that the defendant's later initiation was coerced by (a fruit of) the prior violation. These courts then resort to an exception by evaluating whether sufficient time passed so that any coercive effect may have subsided. *McKinney v. Ludwick*, 649 F.3d 484, 490-491 (6th Cir.2011); *Hill v. Brigano*, 199 F.3d 833, 842 (6th Cir.1999) (applying exception), citing *United States v. Gomez*, 927 F.2d 1530, 1538-1539 (11th Cir.1991), fn. 8 (where officer did not stop talking on request for counsel and within minutes defendant "initiated" conversation, but noting that in other cases, "it may be possible for enough time to elapse between the impermissible further interrogation and the 'initiation' that the coercive effect of the interrogation will have subsided.").

**{¶85}** These cases do not say that the improper continuance of interrogation after invocation of the right to cut off questioning per se immunizes all statements the suspect ever makes to police even on his own initiation of conversation. Whether the issue here is the voluntariness of both statements such as in *Elstad* or *Dixon*, the

totality of the circumstances regarding knowing and intelligent subsequent waiver such as in *Edwards*, the sufficient dissipation of earlier impropriety such as in *McKinney* and *Hill* (plus knowing and intelligent waiver), or a combination of all of these considerations, the issue is a factual question best left for the trial court.

**{¶86}** That is, whether the invocation language used by the defendant was unambiguous was a legal question subject to de novo review; just as it was a legal question as to whether an officer honored an invocation by telling the suspect that he was not done talking and then continuing to engage the suspect in conversation. In contrast, credibility, voluntariness, a knowing and intelligent waiver, and dissipation of the effect of impropriety are more factual in their nature. For instance, it is a matter of credibility as to whether appellant spontaneously reinitiated conversation in the manner described after the detective went upstairs to deliver transport papers (containing the charge). The trial court found that more than an hour after the first interview ended and prior to being transported to jail, the defendant asked to speak with the detective. He asked what the charges were and when he was told the charge was murder, he declared that he wanted to tell the truth. The court found that appellant reinitiated the interview, not the police; thus, the dialogue was reopened. The court also noted that appellant was then *re-Mirandized,* during which he heard his rights being read, he understood them, and signed the waiver, allowing the details of his volunteered new statement to be flushed out by police questioning. The court concluded that appellant's statements were voluntary and not coerced and that the final rights waiver at issue was voluntary, knowing, and intelligent.

**{¶87}** The trial court's factual findings at suppression are upheld if they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Weight of the evidence and credibility of witnesses at the suppression hearing are issues that lie primarily in the province of the trial court. *State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992). We uphold the trial court's findings on those matters, and hold that the second interview on DVD 2, being the product of appellant reinitiating conversation sometime after the first interview had stopped and he was transferred to a holding cell, was admissible as it

was not the fruit of the last hour of DVD 1.  As DVD 2 is not a fruit, DVD 3, which contains appellant's repeating of the self-defense/accidental firing story to his girlfriend prior to being transported to jail, is likewise not a fruit.

**{¶88}** In conclusion, this first two hours of DVD 1 (occurring prior to the alleged invocation) are undisputedly admissible, the last hour of DVD 1 was inadmissible, DVD 2 and 3 were admissible, and the erroneous admission of the last hour of DVD 1 (involving the unidentified shooter story) was harmless beyond a reasonable doubt.  This assignment of error is overruled.

<u>ASSIGNMENTS OF ERROR NUMBERS ONE & FOUR (part two)</u>

**{¶89}** Appellant's first and part two of his fourth assignments of error contend:

**{¶90}** "THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON 'KNOWINGLY' AND 'PURPOSELY', ESSENTIAL ELEMENTS OF THE CRIME OF TAMPERING WITH EVIDENCE, AND WHEN IT RELIEVED THE STATE OF ITS BURDEN TO PROVE SPECIFIC INTENT."

**{¶91}** "DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE * * * TAMPERING WITH EVIDENCE INSTRUCTIONS GIVEN TO THE JURY."

**{¶92}** Appellant was charged with tampering with evidence due to the disposal of the murder weapon.  The argument is not that the trial court failed to set forth all of the elements of this offense, which it did, but that the instruction was faulty because:  (1) the court stated that it had previously defined knowingly when it had not; (2) the court stated that purpose was an element (and had previously defined it), but then, when defining the elements of the offense, the court failed to mention purpose again when directing the jury to prior definitions; and (3) the court referred to its prior definition of motive where the mention of purpose should have occurred.  In combining the latter two arguments, appellant asserts that the court essentially eliminated the instruction on the mental state involving purpose.

**{¶93}** We begin by back-tracking to the instruction on aggravated murder where the court defined the mental state of purposely by stating that a person acts purposely when it is his specific intention to cause a certain result.  (Tr. 703).  The

court instructed that purpose is a decision of the mind to do an act with a conscience objective of producing a specific result. (Tr. 703-704). The court also stated that the purpose with which a person does an act is determined from the manner in which it is done and all the existing circumstances. (Tr. 704). After defining purpose, the court instructed that proof of motive is not required, the presence or absence of motive is one of the circumstances bearing upon purpose, and where an act is a crime, a good motive or purpose is not a defense. (Tr. 705).

**{¶94}** Later, the court set forth the essential elements of tampering with evidence: the defendant, knowing that an official proceeding or investigation was about to be or was likely to be instituted, did alter, destroy, conceal, or remove anything with purpose to impair its value or availability as evidence in such proceeding or investigation. (Tr. 710). *See* R.C. 2921.12(A)(1). The court then further discussed these elements. First, the court said: "I have previously defined knowingly and how it's determined." However, the court had not previously done this; nor did the court later define knowingly.[3] Next, the court defined official proceeding and investigation and noted that the terms alter, destroy, conceal, and remove were self-explanatory. (Tr. 710-711). The transcript then shows the court saying, "How determined, I've already defined that." It appears that the word "purposely" at the beginning of this sentence was omitted in transcription or in speaking. Then, the court said, "Motive, I've previously explained what motive is and whether it's not needed to be proven." Finally, the court stated that the word impair was self-explanatory. (Tr. 711).

**{¶95}** A defendant is entitled to have the jury instructed on all elements that must be proven for the offense. *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, 950 N.E.2d 931, ¶ 15. In examining the trial court's jury instructions, we must review the court's charge as a whole, not in isolation, to determine whether the jury was

---

[3]It appears the instructions read like this because the state initially anticipated a preceding instruction on voluntary manslaughter, wherein the element of knowingly would have been defined. *See* State's Proposed Jury Instructions. When voluntary manslaughter was removed from the proposed instruction, the definition of knowingly would have been removed as well.

properly instructed.  *State v. Burchfield*, 66 Ohio St.3d 261, 262, 611 N.E.2d 819 (1993).

**{¶96}** However, no objections were entered during these instructions.  After the instructions were given, the court asked if there was anything the defense wanted the court to redo or change, and defense counsel did not voice any issues with the tampering instruction.  (Tr. 727).  A party may not assign as error the giving or the failure to give any jury instruction unless the party objects prior to the jury retiring to deliberate. Crim.R. 30(A).  Appellant thus asks us to conduct a plain error review here.  Plain error is a discretionary doctrine whereby the appellate court may, but need not, take notice of errors which are obvious and which affect substantial rights that are outcome determinative.  *See* Crim.R. 52 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62 (plain error should be recognized in only the most exceptional circumstances where it is necessary to avoid a manifest miscarriage of justice).

**{¶97}** In assignment of error number four, appellant raises ineffective assistance of appellate counsel for failing to object to the instruction.  Said question inquires whether counsel rendered deficient performance (fell below an objective standard of reasonable representation) by failing to object to the instruction and whether appellant was prejudiced by that failure, i.e. whether there is a reasonable probability that the outcome of the tampering with evidence charge would have been different.  *See State v. Mitts*, 81 Ohio St.3d 223, 234, 690 N.E.2d 522 (1998); *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).  It has also been stated that prejudice from defective representation can justify reversal only where the result of the trial was unreliable or the proceeding fundamentally unfair due to the performance of trial counsel.  *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842-843, 122 L.Ed.2d 180, 189-191 (1993).

**{¶98}** We initially evaluate the effect of the court's failure to define knowingly. A court need not define every element of an offense.  *State v. Gross*, 97 Ohio St.3d 121, 2002–Ohio–5524, 776 N.E.2d 1061, ¶ 105-106.  A court generally defines only

those "technical and legal terms which have a meaning not generally understood by the average juror." *State v. Caver*, 8th Dist. No. 91443, 2009-Ohio-1272, ¶ 84. Terms of common usage need not be defined for the jury. *Gross*, 97 Ohio St.3d 121 at ¶ 106. Notably, appellant does not contest the court's statement that the words alter, conceal, destroy, remove, and impair were self-explanatory.

{¶99} In defining culpable mental states, R.C. 2901.02(B) provides: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." The First District has stated that "[t]he word 'knowingly' is not so technical or mysterious as to be beyond the comprehension of the jury when not told the definition as set forth in R.C. 2901.22(B)." *State v. Jones*, 1st Dist. No. 790410 (June 25, 1980).

{¶100} Such a broad holding is not required here due to the specifics of the particular criminal statute at issue. The tampering with evidence charge dealt with conduct done **with purpose** to impair value or availability as evidence "**knowing** that an official proceeding or investigation is in progress, or is about to be or **likely** to be instituted * * *." (Emphasis added). R.C. 2921.12(A)(1). In this context, the failure to define the word knowing is not a serious error and would not prejudice the defendant. The use of "knowing" before "an official proceeding or investigation is in progress, or is about to be or **likely** to be instituted" lends itself to the common usage of the word knowing. The language of the tampering statute, especially "likely to be instituted," seemingly incorporates the general definition of knowledge that "circumstances probably exist."

{¶101} And, informing the jury that a defendant has knowledge of circumstances if he is "aware that circumstances probably exist" would not have favored the defense in this case. In fact, appellant was convicted of aggravated murder for shooting Quest Wagoner in the head. The person who shot Quest in the head performed any subsequent acts "knowing" that an investigation was in progress or would soon or was likely to be instituted. This case does not present a scenario

where the defendant could claim they did not know an investigation would soon begin or would likely begin.

{¶102} The lack of a specific definition for knowingly under the circumstances here was not outcome determinative, and thus, plain error does not exist. *See State v. Jones*, 7th Dist. No. 05MA218, 2007-Ohio-3183, ¶ 44 (failure to define purposely was not per se plain error as it could not be said that, had purpose been defined, the defendant may not have been convicted of attempted murder where defendant stated, "Die Bitch" as he repeatedly shot victim). There is also no reasonable probability that the outcome would have been different on the tampering charge if the element "knowing" was further defined, and thus the matter does not constitute ineffective assistance of counsel.

{¶103} We turn to the argument that the court's tampering with evidence instruction (by not re-mentioning purpose and then speaking of motive) essentially eliminated the element of purpose. Initially, we reiterated that the court did define the mental state involving purpose when instructing on aggravated murder, and appellant takes no issue with that definition previously provided. It should also be recognized that after the purpose instruction, the court moved into a discussion on motive, and appellant takes no issue with that discussion in the context of the aggravated murder charge. (See review of instructions supra.)

{¶104} As to the tampering instruction, the court did instruct the jury on all of the elements of tampering with evidence, including "with purpose to impair its value or availability as evidence in such proceeding or investigation." (Tr. 710). The court did not define purpose thereafter. However, the term was already defined for the jury. Thus, the court was not required to redefine it. *See, e.g., State v. Miller*, 2d Dist. No. 22433, 2009-Ohio-4607, ¶ 27; *State v. Lane*, 8th Dist. No. 89023, 2007-Ohio-5948, ¶ 40; *State v. Collier*, 10th Dist. No. 82AP-685 (Jan. 17, 1984).

{¶105} Appellant's argument revolves more around the fact that the court (or the court reporter) forgot to put the word purpose before the statement: "How

determined, I've already defined that." (Tr. 711).[4] So, after the court set forth every element of tampering, the court orally listed the elements it already defined (and defined some that it had not) and the word purpose may have been omitted when the court was referring back to the prior definitional instructions.

{¶106} Despite appellant's contention, the end of the tampering instruction does not read as though the court erased what it had just stated was an element: "**with purpose** to impair its value or availability as evidence in such proceeding or investigation." (Emphasis added). (Tr. 710). "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price*, 60 Ohio St.2d 136, 137, 398 N.E.2d 772 (1979), syllabus at ¶ 4. Reading the entire charge, prejudice is not apparent in failing to redefine purpose.

{¶107} Finally, the motive instruction, referring back to the prior uncontested motive instruction, did not effectively result in the elimination of the purpose element due to the failure to redefine purpose. The court had instructed for aggravated murder that proof of motive is not required, the presence or absence of motive can be a circumstance bearing on purpose, and a good motive is not a defense. And, no issue is taken with those instructions.

{¶108} "Intent and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted." *See, e.g.*, *State v. Wyant*, 64 Ohio St.3d 566, 597 N.E.2d 450 (1992), fn. 8,[5] quoting Black's Law Dictionary (6 Ed.1990) 810. "A person's motive for a crime, i.e., the reason why the crime was committed, is distinct from the defendant's culpable mental state, or criminal intent * * *." *State v. Johnson*, 7th Dist. No. 04MA193, 2007-Ohio-3332, ¶ 27. "Motive is a mental state that induces an act; it is a circumstantial fact used to strengthen an inference, drawn from other evidence,

---

[4]The state's proposed instructions stated here, "Purpose, previously defined. How determined, previously defined." Although the jury was provided the written instructions, these were not maintained as "papers of the case" as required by R.C. 2945.10(G).
[5]The ultimate decision in *Wyant* was vacated on a finding that Ethnic Intimidation Acts are constitutional.

that an act was done." *Id.*, quoting *State v. Nichols*, 116 Ohio App.3d 759, 764, 689 N.E.2d 98 (1996)

**{¶109}** There are various offenses involving the language "with purpose to [do some specified act]." See *Wyant*, 64 Ohio St.3d at 597 (stating that burglary is a trespass "with purpose" to commit a felony or a theft and holding: "Purpose in this context is not the same as motive.") However, appellant cites no case where a motive instruction has been invalidated when the statute defining the offense contains such language. Appellant recognizes that the instruction relieving the state from proving the motive for killing Quest was not the same as saying that the state need not show purpose to kill Quest. But still, appellant believes, with regards to tampering, that the instruction that motive is not required is the same as saying that the state need not prove purpose to impair the value or availability of evidence. However, this is not so. *See id.*

**{¶110}** Motive refers to the why of the offense, and why appellant had the specific intent to impair the value or availability of the evidence in an investigation was not a required element. All that mattered was that he had the specific intent to impair the value or availability of the evidence in the investigation; again, his reason for having purpose to impair the value or availability of thing as evidence in an investigation was not an element. For instance, whether he was trying to protect himself or whether he was trying to protect someone else was irrelevant as long as he had the purpose specifically outlined by the court and the tampering statute. We therefore conclude that the court's instruction did not eliminate the tampering with evidence element involving purpose. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶111}** Appellant's second assignment of error alleges:

**{¶112}** "APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE WAS SUPPORTED BY INSUFFICIENT EVIDENCE."

**{¶113}** Sufficiency of the evidence is a legal test dealing with the adequacy, as opposed to the weight, of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In viewing a sufficiency of the evidence argument, a

conviction will not be reversed unless the reviewing court determines, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could find that the elements of the offense were proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998); *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In other words, the evidence is sufficient if, after construing the evidence in the state's favor, reasonable minds can reach different conclusions as to whether each element has been proven beyond a reasonable doubt. *Id.* *See also State v. Bridgeman*, 55 Ohio St.2d 261, 263, 381 N.E.2d 184 (1978). When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991).

{¶114} The elements of the tampering with evidence charge were: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" R.C. 2921.12(A)(1). Appellant argues that the state failed to present sufficient evidence that he concealed or removed the gun *with purpose to impair* its value or availability as evidence in the investigation. He contends that the absence of the murder weapon at the scene plus a defendant's statement that he disposed of the weapon do not sufficiently establish the offense of tampering with evidence. He suggests that his admission about dropping the gun after he fled was not admissible as no other evidence supported the offense of tampering with evidence, employing a corpus delicti argument and relying on *Like* and *Spears* from the Second District.

{¶115} The corpus delicti rule provides that before an out-of-court confession will be admitted, the corpus delicti (the body of the crime: meaning the act and the criminal agency) must be established by evidence outside of the confession. *See State v. Van Hook*, 39 Ohio St.3d 256, 261, 530 N.E.2d 883 (1988), citing *State v. Maranda*, 94 Ohio St. 364, 114 N.E. 1038 (1916). "[T]he standard of proof is not a

demanding one." *Id.* There need only be some evidence outside of the confession that tends to prove some material element of the crime charged (not all elements), and that evidence need not rise to the level of a prima facie case. *Id.* at 251-262.

**{¶116}** The rule was meant to protect a person who not only confessed to a crime that they did not commit but who confessed to a crime that was never committed at all by anyone. *State v. Vaughn*, 7th Dist. No. 03MA49, 2004-Ohio-5122, ¶ 64. It is considered a fairly outdated rule derived from homicide confessions where the decedent actually survived. *Van Hook*, 39 Ohio St.3d at 261. It has thus become more lenient since modern defendants have gained criminal procedural protections in other ways. *Id.* ("the corpus delicti rule is supported by few practical or social policy considerations.") The Supreme Court refuses to apply the rule as strict dogma. *Id.*, citing *State v. Edwards*, 49 Ohio St.2d 31, 35-36, 358 N.E.2d 1051 (1976).

**{¶117}** The Second District has reversed tampering with evidence convictions on sufficiency grounds due to perceived corpus delicti issues. *State v. Sims*, 2d Dist. No. 2008CA92, 2009-Ohio-5875, ¶ 18-29 (insufficient evidence of tampering where defendant had gun in van after shooting and gun was no longer in van after defendant jumped out plus defendant admitted that he dismantled gun and threw the pieces in the reservoir); *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, 899 N.E.2d 188, ¶ 7, 23-25 (reversing for insufficient evidence after sua sponte finding plain error for tampering conviction based upon no gun at shooting scene and defendant's statement to corrections officer that he "threw the gun away"); *State v. Like*, 2d Dist. No. 21991, 2008-Ohio-1873, ¶20-27 (insufficient evidence of tampering based on no gun at murder scene and defendant told police he disposed of the gun in a dumpster).

**{¶118}** However, those holdings are not persuasive. *Compare State v. Hudson*, 2d Dist. No. 2011CA100, 2013-Ohio-2351, ¶ 44 (where there was not a defendant's admission, court reviewed only for weight of the evidence, and could not reverse because only two judges voted to reverse on prior line of cases; suggesting a backing away from a sufficiency position), ¶ 63 (Welbaum, J., dissenting) (stating that

defendant had gun, fled, and did not have gun when he was caught allows a reasonable inference that, during the chase, he disposed of the gun for a purpose prohibited by statute).

{¶119} Initially, we acknowledge the state's argument that the use of a typical sufficiency reversal may not be proper in deciding whether a defendant's statement should have been admitted. The state points out that a sufficiency review is conducted over all the evidence that was admitted, whether or not it was properly admitted. *State v. Abu-Enjeela*, 7th Dist. No. 11MA102, 2012-Ohio-6275, ¶ 18; *State v. Peeples*, 7th Dist. No. 07MA212, 2009-Ohio-1198, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 767 N.E.2d 216, 2002-Ohio-2126, ¶ 80 (on a claim of insufficient evidence, reviewing court considers all evidence admitted at trial), citing *Lockhart v. Nelson*, 488 U.S. 33, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). The appellate court does not rule on all of the evidentiary issues, find various pieces of evidence inadmissible, and then review only the remaining evidence for sufficiency. Rather, if evidence is improperly admitted and the requisite level of prejudice is established, the case is remanded for a new trial, where the state may have other evidence that it did not realize it needed to present due to the favorable admissibility ruling at trial.

{¶120} Language of various cases suggests that the corpus delicti requirement for confessions is a rule of admissibility. *See Van Hook*, 39 Ohio St.3d at 261 (before an out-of court confession will be admitted, the corpus delicti must be established by other evidence); *Edwards*, 49 Ohio St.2d at 35. The Ninth District thus holds that a defendant must object to the admission of his statement below on the basis of corpus delicti or the issue is waived. *State v. Lortz*, 9th Dist. No. 23762, 2008-Ohio-3108, ¶ 11-13 ("the corpus delicti doctrine only involves the admissibility of a confession"); *State v. Sibley*, 9th Dist. No. 23439, 2007-Ohio-7054, ¶ 13-16. *See also State v. Puckett*, 1919 Ohio App.3d 747, 947 N.E.2d 740, ¶ 14 (4th Dist.). Appellant did not object on corpus delicti grounds below.

{¶121} Now, the 1916 *Maranda* case (utilized for much of the *Van Hook* law) does state: "it seems to be conclusively settled: (1) That an extrajudicial confession is not sufficient in and of itself to sustain a conviction of a crime * * *." *Maranda*, 94

Ohio St. at 369. However, the Ninth District ruled that only the *Maranda* syllabus was law and thus refused to address a waived corpus delicti claim under a sufficiency argument. *Sibley*, 9th Dist. No. 23439 at ¶ 14-15. The *Maranda* syllabus simply stated:

**{¶122}** "By the 'corpus delicti' of a crime is meant the body or substance of the crime, included in which are usually two elements: (1) The act; (2) the criminal agency of the act. It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible. The quantum or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case. It is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged." *Maranda*, 94 Ohio St. 364 at syllabus.

**{¶123}** Notably, the Second District has recently stated that where a defendant did not object to the admission of his confession on corpus delicti grounds at trial, he can only proceed with plain error or ineffective assistance of counsel arguments. *See State v. Lee*, 2d Dist. No 25621, 2014-Ohio-627, ¶ 3-4, 20, 22. Thus, their prior sufficiency rulings would likely no longer stand in the future. *See also State v. William*s, 7th Dist. No. 11MA185, 2014-Ohio-1015, ¶ 24, citing *State v. Powell*, 176 Ohio App.3d 28, 39, 2008-Ohio-1316, 889 N.E.2d 1047, 1055 (2d Dist.) (for the proposition that tampering convictions have been upheld when a defendant told the investigating detective she threw the gun away after the shooting); *Hudson*, 2d Dist. No. 2011CA100, 2013-Ohio-2351, ¶ 44, 63.

**{¶124}** In any event, the Second District seems to have applied the corpus delicti rule in *Like, Spears*, and *Sims* with the type of "dogmatic vengeance" disapproved of in *Van Hook*. We also note here that *Van Hook* and the previous Supreme Court cases (mentioning how low the standard is for corpus delicti and how there are few practical or social policy reasons left to support the rule) were pre-*Jenks* cases. As circumstantial evidence now has the same probative value as direct evidence, the application of corpus delicti appears to be an even easier test than it

already was. That is, the fact that a person was shot by the defendant can be used as circumstantial evidence tending to show an element of tampering with evidence in many cases.

{¶125} That said, we apply the fairly lax *Van Hook* corpus delicti rule here. The defendant stated that he shot the victim with a revolver, ran out of the house with the gun, left in his truck, and did not have the gun when he got home. He stated that he dropped the gun, but he could not remember where because he was scared. We thus consider whether, besides appellant's statement, there is some evidence that tends to show some element of tampering with evidence.

{¶126} It has been stated that the lack of a gun at the murder scene may not itself be legally sufficient evidence of tampering with evidence. *See, e.g., State v. Lollis*, 9th Dist. No. 24826, 2010-Ohio-4457, ¶ 30-31 (where police did not search defendant's house or house where he had been dropped off after the shooting, and no statement by defendant); *State v. Beard*, 6th Dist. No. WD-08-037, 2009-Ohio-4412, ¶ 18-21 (inability to find gun alone does not show tampering); *State v. Wooden*, 86 Ohio App.3d 23, 619 N.E.2d 1132 (9th Dist.1993) (no statement by defendant, no evidence defendant's residence was searched). But, those cases did not involve a defendant's statement as to gun disposal and did not discuss corpus delicti. And, these cases did not say that the lack of a gun at the murder scene cannot be considered in evaluating whether there was *some* evidence that *tends* to prove *one* element of the crime, especially where the victim was shot from up close in his own house.

{¶127} That is, the victim was shot in the head while sleeping on his couch, and he died immediately. Police searched the victim's house for a gun and only found one gun in a bedroom drawer which was not the murder weapon per a ballistics test. The police searched the defendant's house and the defendant's car for the gun to no avail. There is nearly incontrovertible evidence that the murder weapon was removed from the scene and some evidence tending to show that it was concealed thereafter.

**{¶128}** Notably, the "some evidence" "that tends to show some material element" standard for admitting a confession nowhere approaches the beyond a reasonable doubt standard used for a typical sufficiency review. *See Maranda*, 94 Ohio St. 364 at syllabus (and need not even constitute a prima facie case). Appellant's truck was in the murder victim's driveway at the approximate time of the shooting. The identity of the perpetrator is not necessary for corpus delicti. *Van Hook*, 39 Ohio St.3d at 262. But, it can tend to show intent. Furthermore, the evidence evaluated need not exclude all other reasonable theories. *Id.* Thus, the theory that a defendant may have accidentally lost the gun would not exclude an alternative theory that he had a purpose to make it unavailable to police.

**{¶129}** Last but not least, as discussed in the prior assignment of error, the shooter (or anyone who removed the gun from the murder scene inside the house) would have known that an investigation was about to be or likely would be instituted, which is the first element of the offense of tampering with evidence. We conclude that there was some evidence tending to prove a material element of tampering so that appellant's statement was properly admitted in accordance with the low-threshold corpus delicti rule for admissions of confessions.

**{¶130}** As for any remaining general sufficiency argument, a rational trier of fact would certainly find the existence of the element that appellant dropped the gun "knowing" an investigation was about to or likely to be instituted. Appellant was found to be the perpetrator of the shooting and a rational trier of fact could find that he *removed* and *concealed* the gun as he stated that he left the house with the gun and got in his truck, he "dropped" it somewhere, and he did not have it when he returned to his house. Some rational trier of fact could also find that appellant removed or concealed the gun *with a purpose* to render it unavailable in the investigation. He fled the house with the gun and entered his truck which was sitting right in the victim's driveway. Appellant's statement that he was scared and he "dropped" the gun at some point before he arrived home need not be read as meaning that he accidentally dropped the gun, which would be a credibility issue in any event.

{¶131} Finally, intent is nearly always established by circumstantial evidence, which has the same probative value of direct evidence, and by rational inferences drawn from the evidence. *See Jenks*, 61 Ohio St.3d at 265 (circumstantial has same value as direct and is often more persuasive), 274-275 (intent need not be proven by direct testimony and must be determined from the surrounding facts and circumstances), 279 (upholding tampering with evidence conviction after reviewing element regarding whether destruction was done with purpose to make evidence unavailable for investigation). Whether appellant removed the gun from the house and dropped it thereafter with the specific intent to make it unavailable for use in the investigation was a question that a rational juror could answer either way (for the state or for the defendant). Thus, there was not insufficient evidence of tampering with evidence. This assignment of error is overruled.

ASSIGNMENTS OF ERROR NUMBERS THREE & FOUR (part 1)

{¶132} Appellant's third and part one of his fourth assignments of error contend:

{¶133} "THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY ON 'CONSCIOUSNESS OF GUILT'."

{¶134} "DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE 'CONSCIOUSNESS OF GUILT' * * * INSTRUCTIONS GIVEN TO THE JURY."

{¶135} The court provided a consciousness of guilt instruction, charging that fleeing from the vicinity of a crime or tampering with evidence does not, in and of itself, raise a presumption of guilt or a guilty connection with the crime. The court warned the jury, "you may not presume the defendant guilty from such evidence." (Tr. 716). The court continued: "However, you may infer a consciousness of guilt regarding the evidence of the defendant's flight and tampering with evidence," explaining that a defendant's flight, tampering with evidence, and related conduct can be considered as evidence of consciousness of guilty and thus of guilt itself. (Tr. 716-717).

{¶136} Under assignment of error number three, appellant presents two issues with the instruction. However, no objection was entered before, during, or after the instruction. Crim.R. 30(A) provides that a defendant cannot raise an issue with a jury instruction on appeal where he did not object below. Appellant thus argues in assignment of error number four that counsel rendered ineffective assistance in failing to object to the instruction. We refer to the law on failure to object and ineffective assistance set forth within the combined analysis of assignments of error one and four (part 2) supra.

{¶137} Appellant initially takes issue with the giving of a consciousness of guilt instruction at all, arguing the record did not support the instruction as there was no evidence of flight from justice, tampering with evidence, or other related conduct to support the giving of a consciousness of guilt instruction. It is well-established that "flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997), quoting *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969).

{¶138} As to whether there was evidence of tampering in the record to support the instruction, appellant does not argue that tampering is not a type of "related conduct" under *Eaton*. Rather, he focuses on his prior arguments concerning the sufficiency of the evidence to support this offense. We refer here to the prior assignment of error where we conducted an actual sufficiency review on that offense. If there was sufficient evidence to support a conviction of tampering with evidence, then there was sufficient evidence for an instruction that tampering can be considered as consciousness of guilt.

{¶139} As for evidence of flight, flight from the crime scene is a type of flight. *See Eaton,* 19 Ohio St.2d at 160 (flight from scene of homicide without attempt to render aid). *See also State v. Stokes*, 7th Dist. No. 08MA39, 2009-Ohio-4820, ¶ 51-57 (flight from vicinity of crime). And, the record supported the giving of the charge. There was evidence that appellant fled the crime scene rather than call for police or an ambulance, along with evidence that made the flight instruction warranted as

suggestive of guilt and to rebut various defenses. For instance, appellant initially told police that he stopped to visit his friend but arrived to find him lying on the couch with blood all over his face. The fact that he fled the scene without calling for help is pertinent here and warrants the instruction. Moreover, appellant later stated that the gun accidentally fired after he disarmed Quest, thus making a flight from the scene instruction pertinent for this reason as well. The decision to give a consciousness of guilt instruction was not plain error, and the failure to object was not a serious error falling below reasonable representation, nor did it render the outcome questionable.

**{¶140}** Next, appellant argues that the consciousness of guilt instruction given was too favorable to the state without the following additional tempering language. "If you find that the facts do not support that the defendant (describe conduct), or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. * * * You alone will determine what weight, if any, to give to this evidence." 4 Ohio Jury Instructions (2005) Section 409.13.

**{¶141}** In a case where counsel *did* timely object to the lack of the other motivation instruction, we declined to find error, noting that the defendant failed to explain how omitting a reference to some other motive was error and stating that there was no defense theory of some other motive for fleeing. *Stokes*, 7th Dist. No. 08MA39 at ¶ 54, 57. We also facially upheld an instruction similar to the one in appellant's case, holding that it did not create a presumption of guilt. *State v. Wright*, 7th Dist. No. 03MA112, 2004-Ohio-6802, ¶ 38, 40.

**{¶142}** Similarly, the trial court here explained that the described conduct "does not, in and of itself, raise a presumption of guilt or a guilty connection with the crime" and reiterated, "you may not presume the defendant guilty from such evidence." (Tr. 716). The court used permissive language in instructing, "you may infer a consciousness of guilt regarding the evidence of the defendant's flight and tampering with evidence," and in explaining that flight, tampering with evidence, and related conduct "can be considered as evidence of consciousness and thus of guilt itself." (Tr. 716-717). The court's instruction did not suggest to the jury that there

was a conclusive presumption as to guilt. *See State v. Montgomery*, 61 Ohio St.3d 410, 575 N.E.2d 167 (1991) (the fact that "may be" modified "inferred" in the trial judge's instruction to the jury supports a conclusion that the jury was not instructed to conclusively presume intent and the jury would not have felt compelled to presume intent). *See also Wright*, 7th Dist. No. 03MA112 at ¶ 38, 40, 43.

{¶143} Moreover, as to the last sentence of the omitted instruction, "You alone will determine what weight, if any, to give to this evidence," the jury was instructed similarly elsewhere, and instructions need not be repeated. For instance, the jury was told that they were the judges of the weight of the evidence. (Tr. 699-702). And, the court had already defined an inference and instructed the jury that they may but are not required to make inferences from established facts. The court added, "Whether an inference is made rests solely with you." (Tr. 699).

{¶144} In sum, counsel did not make a serious error by failing to object to this instruction and the defendant suffered prejudice, i.e. the outcome would not have been different and the reliability of the trial is not implicated. See *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842-843, 122 L.Ed.2d 180, 189-191 (1993). These assignments of error are overruled.

## ASSIGNMENT OF ERROR NUMBER SIX

{¶145} Appellant's final assignment of error provides:

{¶146} "THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE THE REQUISITE FINDINGS PRIOR TO IMPOSITION OF CONSECUTIVE SENTENCES AND WHEN IT SENTENCED APPELLANT TO A MANDATORY FIVE (5) YEAR PERIOD OF POST-RELEASE CONTROL."

{¶147} Appellant was sentenced to thirty years to life for the aggravated murder count to be served after the three year term imposed for the firearm specification. Appellant was also sentenced to three years on the tampering with evidence count to run consecutive to the sentence for the murder.

> "If multiple prison terms are imposed on an offender for
> convictions of multiple offenses, the court may require the offender to

serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

R.C. 2929.14(C)(4)(b) (effective September 20, 2011).

{¶148} Here, there is no indication that the trial court considered the statutorily-required consecutive sentence findings. (Sent.Tr. 12-13); (Feb. 4, 2013 J.E.) The state agrees that the court did not make the necessary findings and that appellant's argument on consecutive sentence findings is meritorious.

{¶149} The state also agrees that the court imposed the wrong term of post-release control. The court imposed five years of mandatory post-release control. Post-release control does not apply to unclassified felonies, such as aggravated murder. *See State v. Clark,* 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 36 (individual sentenced for aggravated murder is not subject to post-release control as that crime is an unclassified felony to which the post-release control statute does

not apply; instead, the person may be subject to parole); *State v. West*, 7th Dist. No. 11MA33, 2012-Ohio-2758, ¶ 45; R.C. 2901.02(A) (distinguishing murder from a degreed felony); R.C. 2929.03(A)(1)(d) (concerning life with parole eligibility after thirty years); R.C. 2967.13(A)(4) (concerning parole eligibility after thirty years); R.C. 2967.28(B)-(C).  Tampering with evidence is a non-violent felony of the third degree that is not a sex offense.  As such, that offense is only subject to *up to three* years of *discretionary* post-release control.  *See* R.C. 2967.28(C).  As conceded by the state, both arguments set forth in this assignment of error must be sustained.

**{¶150}** For the foregoing reasons, the judgment of the trial court regarding appellant's conviction is affirmed, and the case is remanded for resentencing.


Donofrio, J., concurs.
Waite, J., concurs.