[Cite as *State v. Blatchford*, 2016-Ohio-8456.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| STATE OF OHIO, | : | |
| :--- | :--- | :--- |
| Plaintiff-Appellee, | : | CASE NO. CA2015-12-023 |
| | : | O P I N I O N |
| - vs - | | 12/28/2016 |
| | : | |
| JACOB A. BLATCHFORD, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 15CR11735


Martin P. Votel, Preble County Prosecuting Attorney, Kathryn M. West, Preble County Courthouse, 101 East Main Street, Eaton, Ohio 45320, for plaintiff-appellee

Dennis C. Belli, 536 South High Street, 2nd Floor, Columbus, Ohio 43215-5785, for defendant-appellant


**HENDRICKSON, J.**

{¶ 1} Defendant-appellant, Jacob A. Blatchford, appeals his conviction in the Preble County Court of Common Pleas for possession of marijuana and possessing criminal tools. For the reasons set forth below, we affirm in part, reverse in part, and remand the cause for further proceedings.

{¶ 2} On March 16, 2015, appellant was driving his 2012 Ford F350 pickup truck on

the eastbound lanes of Interstate 70 (I-70). Appellant was towing a Featherlite 28-foot enclosed box trailer behind his truck. Appellant was pulled over by Ohio State Highway Patrol Sergeant Shaun Smart after Smart observed appellant follow another vehicle too closely and commit a marked lane violation.

{¶ 3} During the course of the traffic stop, a canine unit was called to the scene. The canine alerted to the trailer. Smart and another officer conducted a search of the trailer and found a freshly painted excavator track arm ("track arm"). A search of the track arm resulted in the discovery of multiple bundles of marijuana, totaling 156 pounds. Appellant was also found in possession of $5,699 in cash.

{¶ 4} Appellant was arrested and subsequently indicted on one count of possession of marijuana in violation of R.C. 2925.11(A) and (C)(3)(g), a felony of the second degree as the amount of the drug involved exceeded 40,000 grams, and one count of possessing criminal tools in violation of R.C. 2923.24(A), a felony of the fifth degree. Each count was accompanied by a forfeiture specification, seeking forfeiture of the 2012 Ford F350 pickup truck, the Featherlite box trailer, and the $5,699 in cash found on appellant at the time he was arrested in accordance with R.C. 2941.1417(A) and 2981.04(A)(1).

{¶ 5} On June 4, 2015, appellant filed a motion to suppress evidence obtained from the traffic stop and subsequent search of the trailer and track arm on the grounds that (1) appellant's detention was unlawful as Sergeant Smart lacked reasonable suspicion to execute a traffic stop and (2) appellant's detention was "unreasonably prolonged." Appellant also sought to suppress from evidence "any statements, which may have been made * * * after his illegal arrest, along with any statements made without [appellant] properly being provided his *Miranda* warnings."

{¶ 6} A hearing on appellant's motion to suppress was held on September 2, 2015. At this time, the state presented a video recording of the March 16, 2015 traffic stop,

photographs of the track arm, and testimony from Smart. The video recording was just over two and one-half hours long, and captured Smart's interaction with appellant from the time of the initial stop to appellant's arrest at Fudge's Wrecker Services ("Fudge's"). The video did not include any statements that appellant may have made to Smart or other law enforcement officers after leaving Fudge's.

{¶ 7} The recording and Smart's testimony revealed that appellant was pulled over on I-70 at approximately 9:49 a.m. on March 16, 2015, after Smart observed appellant follow another vehicle too closely and cross over the solid white line on the right side of the road. Upon approaching appellant's vehicle, Smart discovered appellant was traveling with a "very aggressive" dog. Smart requested appellant step out of the truck and accompany him to the police cruiser. Appellant consented to a frisk of his person, and was placed in the back of the cruiser at approximately 9:52 a.m.

{¶ 8} Smart testified that appellant was "disheveled" and "dirty" when he stepped out of his truck. Appellant had "bloodshot" eyes, appeared "very nervous," and was breathing heavily. Appellant informed Smart that he was a welder who was traveling from Arizona to Michigan to bring a track arm to his brother. The track arm was going to be used to make a sled for use in a tractor pull. Smart found appellant's story suspicious, noting that track arms are "heavy * * * industrial equipment" and that he has never before seen one associated with a tractor pull. Smart also noted that a "great deal of money" was spent on appellant's trip, due to the weight of the item, the price of diesel, and being off work for the time it takes to travel to Michigan and back to Arizona.

{¶ 9} At approximately 9:54 a.m., Smart contacted his dispatch to request a "license, wants, warrants or criminal history check" on appellant. Smart also requested a canine unit be dispatched. Smart asked for the canine unit "fairly quick" into the stop, or within "three to five minutes" of the stop. The canine unit arrived within nine-to-ten minutes of the stop, or by

9:59 a.m. Trooper Michael Mahaffey walked the canine unit around appellant's truck and trailer, and the dog alerted to the trailer.

{¶ 10} Following the canine's alert, Smart allowed appellant to remove his dog from the truck. Both appellant and his dog were placed in the back of Smart's cruiser while Smart and other officers searched the truck and trailer. Smart testified that upon entering the trailer, he noticed the odor of paint and observed that the track arm looked freshly painted. Smart saw four cans of CAT spray paint in the trailer. He also noticed that the track arm had "poor" weld marks on it and that there had been four, large round holes on the track arm. The floor of the trailer was covered in dog urine and dog feces, which Smart stated was a common tactic used by narcotic traffickers to "throw-off" police canine units. Smart testified the canine unit alerted "all over the floor of the trailer" but did not specifically alert to the track arm. However, based on his observations, Smart believed the track arm might contain a false compartment containing contraband. Smart returned to the cruiser, Mirandized appellant, and called for a tow-truck.[1]

{¶ 11} At 10:47 a.m., a tow truck removed appellant's truck and trailer from the side of I-70. Ten minutes later, the truck and trailer arrived at Fudge's in Preble County, Ohio. Fudge's is located next to a construction company. Smart was able to view track arms that were similar in size at the neighboring construction company. He also pulled up pictures of

---

1. {¶ a} The video recording of the traffic stop demonstrates that Smart advised appellant of his *Miranda* rights at 10:16 a.m., while at the scene of the initial traffic stop. At this time, appellant indicated he understood his rights. At the motion to suppress hearing, Smart testified that appellant was not Mirandized until he was taken to Fudge's Wrecker Service. Smart testified that while at Fudge's appellant was advised of his rights, stated he understood his rights, and invoked his right "to speak with an attorney" when questioned about his brother in Michigan. According to Smart, after invoking his right to an attorney, appellant did not make any other incriminating statements.

{¶ b} The video recording submitted into evidence clearly demonstrates that appellant was advised of his rights at 10:16 a.m., while appellant was at the scene of the initial traffic stop. The recording does not show appellant being re-read his *Miranda* rights while at Fudge's or invoking his right to counsel at Fudge's. The recording does show, however, that at approximately 11:35 a.m., while at Fudge's, appellant informed Smart that he's "done talking." Appellant' continued talking, however, when he informed Smart he had been "through this stuff" before and that "every time I don't have nothing."

different track arms on his cell phone. No other track arm had circular holes on their sides. The neighboring construction employees informed Smart that the holes in appellant's track arm destroyed the integrity of the equipment. According to Smart, "Looking at the weld marks in different areas and the holes themselves, the unprofessional nature of them, based on experience, it looked like they were deliberately placed where they were to be access into the interior possibly for multiple false compartments inside[.]"

{¶ 12} At approximately 11:27 a.m., Smart discussed his observation and findings with appellant, who denied that the track arm had anything in it. Appellant told Smart he had not welded the holes on the side of the track arm, but that the track arm "came like that" when he "got it" from a junkyard in Idaho. Appellant claimed he was innocent of any wrong doing. When Smart asked for contact information for appellant's brother, appellant told Smart, "Let's just wait till you get all this done first." Then, at 11:35 a.m., appellant told Smart, "I'm done talking." However, appellant kept talking to Smart, stating that he had "been through this stuff before" and "every time I don't have nothing."

{¶ 13} Smart had a mechanic at Fudge's drill a hole into one of the welded-over circular ports on the track arm. Once the hole was drilled, two canines that were on the scene alerted to the odor of narcotics coming from the hole. Smart testified that he was also able to smell narcotics, specifically the odor of powder cocaine and raw marijuana. Smart arrested appellant at 11:58 a.m., and found him in possession of $5,699 in cash.

{¶ 14} Smart determined that it was necessary to cut open the track arm further, but Fudge's did not have the right equipment to cut through the steel arm. Appellant's truck and trailer were transported to Unger's Fabrication ("Unger's"), where a plasma torch was used to gain access to the track arm. Once the track arm was opened, 156 pounds of marijuana was found.

{¶ 15} At the conclusion of Smart's testimony, the trial court admitted into evidence

the video recording of the traffic stop and photographs of the search of the track arm. The state then proceeded to argue the merits of why appellant's motion to suppress should be denied. In its argument, the state represented the following to the trial court: "There are no statements to suppress in this case, Your Honor. The Defendant made no statements after being read his rights. So the State would ask that the Motion to Suppress be denied in its entirety." After hearing argument from defense counsel, the trial court took the matter under advisement.

{¶ 16} On September 10, 2015, the trial court issued a decision denying appellant's motion to suppress. The court found that Smart had sufficient grounds to initiate the traffic stop after observing appellant driving "too close" to another vehicle and failing to drive within the marked lanes. With respect to the canine-sniff and subsequent search of the track arm, the court stated the following:

> The canine arrived and alerted within ten to eleven minutes, which is well within the usual time for the normal traffic stop. Given that there was no detention beyond the time needed to complete a normal stop, Smart did not need to have a reasonable articulable suspicion of criminal behavior.
>
> Once the canine alerted, Smart had probable cause to search the trailer and its contents. The alert itself supports the continued delay until the [track arm] was actually searched, which delay was admittedly long (approximately one and a half to two hours from the canine's alert to the first access to the interior of the [track arm] by drilling through the heavy gauge steel).

The court's decision did not address that portion of appellant's motion seeking to suppress "any statements" made after his arrest or "any statements" made without appellant being properly advised of his *Miranda* rights.

{¶ 17} On November 23, 2015, a jury trial was held. At this time, the state presented testimony from Smart and Trooper Penny Beatty, a criminal patrol investigator with the Ohio State Highway Patrol. The state also introduced into evidence a video recording of

appellant's traffic stop, videos and photographs of law enforcement's search of the track arm, an audio recording of an interview between appellant and Beatty, the Highway Patrol's Property Control form detailing the marijuana bundles found in the track arm, and a controlled substance examination report from the Highway Patrol's crime lab.

{¶ 18} Smart's testimony at trial was very similar to his testimony at the suppression hearing.[2] Smart described his stop of appellant's vehicle on I-70, the subsequent arrival and alert of the drug dog, the search of appellant's truck and trailer, the removal of the trailer to Fudge's and Unger's in order to gain access to the track arm, and the discovery of the marijuana inside the track arm. Thereafter, Beatty testified about her interview of appellant while at Unger's. During this interview, appellant told Beatty he was traveling to Michigan to see his brother but that his brother "doesn't have anything to do with this." Appellant informed Beatty he had purchased the track arm seven months prior in Idaho, and that he was planning to sell the track arm to a farmer in Michigan. When Beatty informed appellant that he was in a lot of trouble, appellant acknowledged, "I know I am."

{¶ 19} After the state presented its case-in-chief, appellant moved for acquittal pursuant to Crim.R. 29 and requested that the trial court, rather than the jury, decide the forfeiture specifications. The trial court denied appellant's Crim.R. 29 motion, but granted appellant's request to have the forfeiture specifications tried to the bench. Thereafter, appellant rested his defense without calling any witnesses. The jury returned guilty verdicts on both counts, finding that appellant had been in possession of more than 40,000 grams of marijuana and had possessed criminal tools.

{¶ 20} On December 9, 2015, the trial court held a forfeiture hearing and a sentencing

---

2. As we will discuss in our resolution of appellant's second assignment of error, Smart's trial testimony deviated from his testimony at the suppression hearing with respect to when and where *Miranda* warnings were given to appellant.

hearing. At this time, the state withdrew its request for forfeiture of appellant's 2012 Ford F350 pickup truck. After hearing from the state and appellant, the trial court granted the state's request for forfeiture of the Featherlite box trailer and the $5,699 in cash found on appellant. Appellant was then sentenced to a 12-month prison term for possessing criminal tools and to an eight-year mandatory prison term for possession of marijuana, with the prison terms being run concurrently. The trial court imposed a $15,000 mandatory fine and suspended appellant's driver's license for six months.

{¶ 21} Appellant timely appealed his conviction and sentence, raising five assignments of error.

{¶ 22} Assignment of Error No. 1:

{¶ 23} THE COURT OF COMMON PLEAS COMMITTED REVERSIBLE ERROR WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION TO SUPPRESS MARIJUANA THAT WAS SEIZED BY THE HIGHWAY PATROL DURING A WARRANTLESS DESTRUCTIVE SEARCH OF HIS PROPERTY IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION.

{¶ 24} In his first assignment of error, appellant argues the trial court erred by denying his motion to suppress. Appellant does not dispute the lawfulness of his initial stop for following another vehicle too closely and committing a marked lane violation. Rather, appellant argues his motion to suppress should have been granted as (1) the state failed to present evidence demonstrating that the "dog sniff" occurred while Smart was actively engaged in the process of ticketing appellant for the traffic violation and (2) the search of appellant's vehicle was not supported by probable cause. With respect to the latter argument, appellant first asserts that the positive dog alert cannot support a finding of probable cause as the state failed to present evidence regarding the dog's training and ability

- 8 -

to distinguish between the odors of narcotics and "conflict odors." He further contends the automobile exception to the warrant requirement was inapplicable and that Smart's opinions regarding the suspicious nature of the track arm "amounted to little more than a hunch" that it might contain a false compartment.

{¶ 25} Our review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

**Canine Sniff and Duration of the Stop**

{¶ 26} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures, including unreasonable automobile stops." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 11. When the police stop a vehicle based on probable cause that a traffic violation has occurred, the stop is reasonable under the Fourth Amendment. *Id.*; *State v. Thomas,* 12th Dist. Warren No. CA2012-10-096, 2013-Ohio-3411, ¶ 19.

{¶ 27} When detaining a motorist for a traffic violation, "a police officer may detain the motorist for a time period sufficient to allow the officer to issue a ticket or a warning, or to run a computer check on the driver's license, registration and vehicle plates." *State v. Coleman*, 12th Dist. Fayette No. CA2011-09-020, 2012-Ohio-3630, ¶ 11, citing *State v. Batchili*, 113

Ohio St.3d 403, 2007-Ohio-2204, ¶ 12. *See also Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1615 (2015) (noting that "ordinary inquiries" incident to a traffic stop typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"). "'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *Batchili* at ¶ 12, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598-599 (9th Dist.1995).

{¶ 28} Both Ohio courts and the United States Supreme Court have determined that "the exterior sniff by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the Constitution." *State v. Grenoble*, 12th Dist. Preble No. CA2010-09-011, 2011-Ohio-2343, ¶ 30; *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637 (1983). *See also Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834 (2005). "'Police are not required to have reasonable suspicion that a vehicle contains drugs prior to conducting a canine sniff of the vehicle during a traffic stop, *so long as the duration of the traffic stop is not extended beyond what is reasonably necessary to resolve the issue that led to the stop and issue a traffic citation.*'" (Emphasis added.) *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 13, quoting *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 20. However, if the traffic stop is extended in order to allow a drug-sniffing dog to be brought to the scene, "police must have a reasonable suspicion that the vehicle contains drugs in order to justify the continued detention." *Id.*

{¶ 29} The United States Supreme Court recently noted that

> a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if

it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

*Rodriguez*, 135 S.Ct. at 1612, quoting *Caballes*, 543 U.S. at 407. "The reasonableness of a seizure * * * depends on what the police in fact do." *Id.* at 1616. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket * * * but whether conducting the sniff 'prolongs' – i.e., adds time to – 'the stop.'" *Id.*

{¶ 30} In the present case, the trial court found the canine sniff lawful, noting that the canine "arrived and alerted within ten to eleven minutes, which is w*ell within the usual time for the normal traffic stop*. Given that there was no detention beyond the tim*e needed to complete a normal stop*, Smart did not need to have a reasonable articulable suspicion of criminal behavior." (Emphasis added.) The trial court, therefore, framed its decision in terms of a "normal traffic stop" rather than the particulars of appellant's traffic stop. This was an error, as the relevant inquiry is whether the canine sniff prolonged Smart's mission of issuing a ticket for appellant's violations of following too closely and committing a marked lane violation. However, the trial court's error was harmless, as Smart's testimony and the video recording of the stop demonstrates that Smart did not extend the duration of the traffic stop beyond what was reasonably necessary to resolve the issue that led to the traffic stop and issue a traffic citation.[3]

{¶ 31} At the motion to suppress hearing, Smart testified that as a "general rule of thumb, a normal traffic stop is between 15 and 20 minutes." Smart's description of the traffic stop, as well as the video recording of the stop, demonstrated that a canine unit was requested within "three to five minutes" of the stop, the canine unit arrived on the scene within ten minutes of the stop, and the canine alerted to the trailer within 12.5 minutes of the stop. Smart's activities during the interval between the initial stop and the time the canine

---

3. At the suppression hearing, Smart testified that appellant was issued a traffic citation for following too closely.

arrived and alerted on appellant's trailer were captured on the video recording. The recording shows that Smart was in contact with his dispatch and had requested a "license, wants, warrants, [and] criminal history check" during this time. While waiting for this information to come back from dispatch, the canine unit arrived on the scene. The video recording shows that at the time the canine alerted on appellant's trailer, Smart was actively engaged in a discussion with appellant about the lane line violation. The recording, therefore, contains competent credible evidence that Smart did not extend the duration of the traffic stop beyond what was reasonably necessary to issue a traffic citation.

{¶ 32} In reaching this determination we note that there was no evidence introduced indicating that Smart prolonged his investigation of the traffic offenses in order to allow the canine sniff of appellant's vehicle to be completed. "In the absence of some evidence that the normal procedures were delayed for reasons unrelated to the investigation of the traffic violation, the only reasonable conclusion to draw from the evidence is that the length of appellant's detention was no longer than necessary to investigate the traffic violation and issue the ticket." *Neal*, 2016-Ohio-1406 at ¶ 23. *See also State v. Reece*, 1st Dist. Hamilton No. C-140635, 2015-Ohio-3638, ¶ 25. Given the record before us, we find that the canine sniff did not prolong the duration of the traffic stop and, therefore, did not infringe on appellant's rights under the Fourth Amendment to the United States Constitution or Section 14, Article I of the Ohio Constitution.

**Canine's Training and Ability to Distinguish Conflict Odors**

{¶ 33} In denying appellant's motion to suppress, the trial court found that "[o]nce the canine alerted, Smart had probable cause to search the trailer and its contents." Appellant contends, for the first time on appeal, that "in the absence of testimony regarding the dog's training and ability to distinguish between narcotics and conflict odors," the dog's positive alert does not support a finding of probable cause to search the trailer or its contents. In

response, the state argues appellant has waived this argument by failing to raise the issue of the canine's reliability and training in his written motion to suppress or at the suppression hearing. We agree.

{¶ 34} Crim.R. 12 provides, in relevant part, as follows:

(C) Pretrial motions. Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:

* * *

(3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained. Such motions shall be filed in the trial court only.

* * *

(H) Effect of failure to raise defenses or objections. Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial, at the time set by the court pursuant to division (D) of this rule, or prior to any extension of time made by the court, *shall constitute waiver of the defenses or objections*, but the court for good cause shown may grant relief from the waiver.

(Emphasis added.)

{¶ 35} "To suppress evidence obtained as a result of a warrantless search or seizure, the defendant must raise the grounds on which the validity of the search or seizure is challenged with enough specificity to give the prosecutor notice of the basis for the challenge." *State v. Mixner*, 12th Dist. Warren No. CA2001-07-074, 2002 WL 83742, *2 (Jan. 22, 2002), citing *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), paragraph one of the syllabus. "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived." *State v. Shindler*, 70 Ohio St.3d 54, 58 (1994).

**{¶ 36}** Here, appellant never put the state or the trial court on notice of his intent to challenge the training and reliability of the canine. With respect to the traffic stop and subsequent search of the trailer and its contents, appellant's motion to suppress only raised the issues of (1) the "unlawful detention [of appellant] on the grounds that the officers lacked reasonable suspicion to execute a traffic stop of the [appellant's] vehicle" and (2) "the officer's unreasonably prolonged detention of the [appellant]." By failing to raise the issue of the canine's reliability and training in his motion to suppress or at the suppression hearing, appellant waived the issue and we need not consider the issue on appeal. *See Neal*, 2016-Ohio-1406 at ¶ 29; *Columbus v. Ridley*, 10th Dist. Franklin No. 15AP-84, 2015-Ohio-4968, ¶ 28 ("'It is well-settled law that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived.' * * * This well-settled waiver rule applies to arguments not asserted either in a written motion to suppress or at the suppression hearing").[4]

**Automobile Exception**

**{¶ 37}** Appellant also argues that the search of the track arm was without probable cause as it did not fall within the automobile exception to the warrant requirement. Appellant contends that because the canine did not alert specifically to the track arm, law enforcement was not entitled to conduct a warrantless search of the track arm. We disagree.

**{¶ 38}** "Under the automobile exception to the warrant requirement, once police officers obtain probable cause to believe the vehicle contains contraband, the officers may search the vehicle." *State v. Banks-Harvey*, 12th Dist. Warren No. CA2015-08-073, 2016-

---

4. We also note that at the motion to suppress hearing, defense counsel did not question Smart about the canine's reliability or training. On direct examination, Smart was asked about the canine and its alert to appellant's trailer. Smart testified that he was "familiar" with the canine, knew that "he was a good dog," had seen the canine alert to the presence of narcotics in the past, and he saw the canine alert to appellant's trailer. Although appellant had the opportunity to challenge the canine's reliability and training on cross-examination, defense counsel did not raise the issue. *See, e.g., Florida v. Harris*, __ U.S. __, 133 S.Ct. 1050, 1057 (2013). The issue was, therefore, waived.

Ohio-2894, ¶ 15, citing *State v. Raphael*, 12th Dist. Warren Nos. CA2014-11-138 and CA2014-11-139, 2015-Ohio-3179, ¶ 23. Probable cause to search a vehicle and its contents exists where a narcotics dog "alerts to the odor of drugs from a lawfully detained vehicle." *State v. French*, 104 Ohio App.3d 740, 749 (12th Dist.1995). *See also State v. Robinson*, 4th Dist. Lawrence No. 14CA24, 2016-Ohio-905, ¶ 26. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157 (1982).

{¶ 39} In the present case, there was probable cause for the officers to search the track arm pursuant to the automobile exception. The drug dog alerted to the trailer containing the track arm and, once inside the trailer, continued to alert "all over the floor of the trailer." Smart explained the trailer's floor was covered in dog urine and feces, a tactic commonly used by drug traffickers to "throw-off" narcotic dogs. Upon entering the trailer, Smart smelled a strong odor of paint, noticed four cans of CAT spray paint in the trailer, and observed that the track arm had been freshly painted in an unprofessional manner. Smart also noticed that the track arm had four, large round holes on it and that there were "non-factory" and "poor-looking" welds on the track arm. Based on the dogs' alerts and Smart's observations and experiences, Smart had reason to believe that the track arm contained a false compartment filled with contraband. Smart, therefore, had probable cause to search the entire trailer, including the track arm, pursuant to the automobile exception. *See Ross* at 825.

## "Hunch" vs Probable Cause

{¶ 40} Appellant also argues that "[e]ven if * * * a warrant was unnecessary, [Smart] still needed sufficient probable cause to conduct a seizure and destructive search of the [track] arm." He contends Smart's "generalized hunch" that altercations were made to the

boom arm "falls short of the level of probable cause needed to justify a seizure and destructive search of the cargo following a vehicle stop." In support of his argument that Smart lacked probable cause to believe the track arm contained contraband, appellant points to the fact that Smart is not a welder, excavator, or equipment designer. Appellant also relies on the fact that Smart conducted additional research on the track arm upon arriving at Fudge's before having the arm drilled into.

{¶ 41} As set forth above, the canine's positive alerts and Smart's observations inside the trailer gave him probable cause to search the track arm. Smart did not need to be an expert in the field of construction to identify sloppy, unprofessional paint work or poor-looking welding marks. Smart could determine that something looked amiss with appellant's track arm by comparing his observations of appellant's track arm to construction equipment he had previously encountered in his day-to-day experiences.

{¶ 42} The United States Supreme Court recognized in *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975 (1970), that "[f]or constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." Here, probable cause to search the track arm existed at the scene of the traffic stop. If Smart had been in possession of the tools he needed to cut open the track arm, Smart would have been justified in drilling into the track arm on the side of the road. However, the steel composition of the track arm required law enforcement to take the track arm to a secondary location to obtain the proper tools to gain access to the machinery. Smart's subsequent investigation of excavator track arms upon his arrival at Fudge's does not undermine the existence of probable cause. While Smart's subsequent internet search and discussion of track arms with the neighboring construction company cannot be used to establish probable cause to seize and search the track arm, it in no way lessens the probable

cause that was established at the scene of the initial traffic stop.

{¶ 43} Therefore, for the reasons set forth above, we find no merit to the arguments set forth in appellant's first assignment of error. The trial court did not err in denying appellant's motion to suppress. Appellant's first assignment of error is overruled.

{¶ 44} Assignment of Error No. 2:

{¶ 45} DEFENDANT-APPELLANT WAS DENIED HIS RIGHTS UNDER CRIM.R. 12(F) AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO AN ADJUDICATION AS TO THE ADMISSIBILITY OF HIS CUSTODIAL STATEMENTS DUE TO MISDIRECTION BY THE STATE, THE INEFFECTIVE ASSISTANCE OF HIS OWN ATTORNEY, AND INATTENTION ON THE PART OF THE TRIAL COURT.

{¶ 46} In his second assignment of error, appellant contends he was denied the right to an adjudication of his motion to suppress his statements to law enforcement due to the fault of the trial court, the prosecutor, and his defense counsel. Appellant contends the prosecutor's statement at the motion to suppress hearing that "[t]here are no statements to suppress in this case, Your Honor. The Defendant made no statements after being read his rights," mislead the trial court and resulted in his motion to suppress not being fully resolved. Relying on the conflicting evidence presented at the motion to suppress hearing as well as the audio recording of his interview with Trooper Beatty presented at trial, appellant contends he is entitled to an adjudication as to if and when he invoked his right to remain silent and his right to an attorney, whether such rights were ever relinquished, and, if not, what statements to Smart and Beatty were excludable from evidence.

**_Miranda_ and the Admissibility of Statements**

{¶ 47} The Fifth and Sixth Amendments to the United States Constitution guarantee, respectively, that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel.'" *Miranda*

*v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602 (1966); *State v. Barker*, Slip Opinion No. 2016-Ohio-2708, ¶ 21. Therefore, pursuant to the protections awarded by the constitution, the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* at 444. "Prior to questioning, the police must warn a suspect 'that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Barker* at ¶ 22, quoting *Miranda* at 444.

{¶ 48} If a custodial interrogation continues without the presence of an attorney after a suspect has been advised of his rights, the government bears "a heavy burden" of demonstrating by a preponderance of the evidence that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" before speaking to the police. *Miranda* at 475, 86 S.Ct. 1602, citing *Escobedo v. Illinois,* 378 U.S. 478, 490, 84 S.Ct. 1758 (1964), fn. 14. *See also Barker* at ¶ 23. "A court may not presume a valid waiver either from the suspect's silence after warnings are given or from the fact that the suspect eventually confessed." *Id.*, citing *Miranda* at 475. Instead, the record must demonstrate that "'an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'" *Miranda* at 475, quoting *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884 (1962). If the state fails to meet its burden, "no evidence obtained as a result of interrogation can be used" against the defendant. *Id.* at 479; *Barker* at ¶ 23.

{¶ 49} In the present case, the trial court did not make any findings with respect to whether appellant was "properly provided" his *Miranda* rights or whether such rights were invoked or knowingly and intelligently waived. As discussed below, the court's failure to

make such findings substantially affected appellant's right to a fair trial.

**Motion to Suppress:  Appellant's Statement to Smart – "I'm done talking"**

{¶ 50}   At the motion to suppress hearing, there was conflicting evidence presented as to when appellant was given his *Miranda* rights.  Smart testified he *Mirandized* appellant at Fudge's.  However, the audio recording demonstrates appellant was *Mirandized* while at the scene of the traffic stop.  Regardless of where he was advised of his rights, the record clearly demonstrates that at 11:35 a.m., *after* being *Mirandized*, appellant told Smart, "I'm done talking" while they were at Fudge's.  The effect of this statement was never determined by the trial court.

{¶ 51}   Pursuant to Crim.R. 12(F), a motion to suppress "shall be determined before trial."  A trial court's failure to rule upon a motion to suppress prior to trial constitutes error. *State v. Tolbert*, 70 Ohio App.3d 372, 388 (1st Dist.1990).  However, such error is harmless "unless it adversely affects the substantial rights of the defendant."  *Id.  See also State v. Johnson*, 12th Dist. Warren No. CA2015-09-086, 2016-Ohio-7266, ¶ 64.

{¶ 52}   Given the record before us, we find that appellant's substantial rights were adversely affected by the trial court's failure to rule on his motion to suppress.  Appellant's motion sought to suppress "any statements" made after his arrest or "any statements" made in violation of his rights under *Miranda*.  The law is clear that a defendant has the opportunity to exercise his *Miranda* rights throughout the entirety of an interrogation and that an "interrogation must cease when the defendant exercises his 'right to cut off questioning,' which must be scrupulously honored."  *State v. Miller*, 7th Dist. Mahoning No. 13 MA 12, 2014-Ohio-2936, ¶ 41, citing *Miranda* at 473-474 and *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321 (1975).  Where a defendant initially waives his right to remain silent, but later invokes this right, "the subsequent assertion of the right during the interview must be unambiguous in order to require the police to stop."  *Id.*, citing *Berghuis v. Thompkins*, 560

U.S. 370, 381, 130 S.Ct. 2250 (2010). *See also State v. Murphy*, 91 Ohio St.3d 516, 520 (2001) (finding that a suspect must articulate his desire to remain silent or cut off questioning "sufficiently clearly" so that a reasonable police officer under the circumstances would understand the statement to be an invocation of the right to remain silent).

{¶ 53} In the present case, the trial court should have looked at the circumstances surrounding appellant's statement that he was "done talking" and determined whether appellant invoked his right to remain silent. *See, e.g., Miller*, 2014-Ohio-2936 (finding the circumstances surrounding a defendant's repeated statements that "I'm done talking" and "I'm done talking. There's nothing else to talk about" was an unambiguous invocation of the right to remain silent); *State v. Nowlin*, 5th Dist. Muskingum No. CT2012-0015, 2012-Ohio-4923 (finding a defendant's response of "yeah" following an officer's question of "You done talking?" was not an unambiguous assertion of the right to remain silent). Not only is this issue determinative of whether some of appellant's statements to Smart at Fudge's are admissible, but, as discussed below, it impacts whether statements appellant later made to Beatty at Unger's are admissible.

{¶ 54} Accordingly, based on the record before us, we find prejudicial error in the trial court's failure to rule on appellant's motion to suppress any statements he made after indicating he no longer wished to speak with law enforcement officers. We therefore sustain appellant's second assignment of error to this extent. The trial court's denial of appellant's motion to suppress is reversed and the cause remanded for a determination of whether appellant unambiguously invoked his right to remain silent based on the existing record. If the trial court finds that appellant invoked his right to remain silent, the court should then determine whether appellant later relinquished this right by initiating further conversation with law enforcement.

**Ineffective Assistance of Counsel: Statements to Beatty**

{¶ 55} In addition to finding reversible error for the trial court's failure to rule on appellant's motion to suppress his statements to Smart, we also find that appellant's trial counsel provided ineffective assistance when he failed to seek suppression of appellant's statement's to Beatty.

{¶ 56} On June 4, 2015, defense counsel filed a motion to suppress "any statements" made by appellant after his arrest and "any statements" made without appellant being properly provided his *Miranda* rights. At the time this motion was filed, the state had already filed its initial response to appellant's request for discovery. In its initial discovery response, the state indicated that "oral statements made by the defendant, if any, are included in the attached police report." The police reports attached to the discovery response, however, did not include appellant's statement to Beatty.[5] The state did not provide Beatty's statement to appellant until November 19, 2015, which was well after the suppression hearing was held and appellant's motion decided by the trial court.

{¶ 57} At the suppression hearing, the only evidence presented by the state was Smart's testimony, photographs of the track arm, and a two-and-one-half hour long recording of the traffic stop, which concluded with appellant sitting in the back of Smart's cruiser at Fudge's. Smart testified at the hearing that after he *Mirandized* appellant and asked about appellant's brother, appellant "advised at that point he wanted to speak with an attorney." According to Smart, appellant did not make any other incriminating statements after requesting an attorney. The state's representation that "[t]here are no statements to suppress in this case, Your Honor. The Defendant made no statements after being read his rights" appeared to support Smart's testimony that appellant had made no statements after asking to speak with an attorney.

---

5. The state's initial discovery response also indicated that "4 CDs" were being provided to defense counsel with its discovery response. It is unclear from the record what the contents of these 4 CDs included.

{¶ 58} However, at trial, the state presented testimony from Beatty. Beatty testified about her interview of appellant at Unger's and an audio recording of this interview was admitted into evidence without any objection from defense counsel. Appellant contends his trial counsel's failure to object to this evidence or request that the trial court conduct a hearing outside the jury's presence to determine if suppression of such evidence was appropriate amounts to deficient performance, and that he was prejudiced by this deficiency. Appellant asserts that the "audio recording of the interview indicates Beatty initiated the interview, did not re-administer *Miranda* warnings prior to questioning him, did not honor his prior request for counsel, and did not obtain a waiver of his Fifth and Sixth Amendment rights." He contends that "if the issue had been fully litigated, the trial court would have been bound to suppress the custodial statements."

{¶ 59} "To establish a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's actions were outside the wide range of professionally competent assistance, and that prejudice resulted by reason of counsel's actions." *State v. Ullman,* 12th Dist. Warren No. CA2002-10-110, 2003-Ohio-4003, ¶ 43, citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). To show prejudice, a defendant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Wilson,* 12th Dist. Madison No. CA2013-10-034, 2014-Ohio-2342, ¶ 17, quoting *Strickland* at 694.

{¶ 60} We begin our review mindful that the failure to file a motion to suppress does not constitute per se ineffective assistance of counsel. *State v. Smith,* 12th Dist. Fayette No. CA2014-05-013, 2015-Ohio-1094, ¶ 44. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must be able to prove that there was a basis for suppression of the evidence in question. *State v. Robinson,* 12th Dist. Butler No. CA2014-12-256, 2015-Ohio-4649, ¶ 49; *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837,

¶ 65. Even when there is some evidence in the record to support a motion to suppress, "an appellate court presumes that defense counsel was effective if defense counsel could reasonably have decided that the motion to suppress would have been futile." *State v. Dominguez,* 12th Dist. Preble No. CA2011-09-010, 2012-Ohio-4542, ¶ 20.

{¶ 61} In the present case, we face an undeveloped record. The video recording from the traffic stop (entered into evidence both at the suppression hearing and at trial) ends while appellant is sitting in the back of Smart's cruiser at Fudge's. From Smart's testimony at the suppression hearing and at trial, it appears that at some point appellant advised Smart he wanted to speak with an attorney.[6] It is well established that if, after *Miranda* warnings have been given, a suspect asserts his right to counsel, "the interrogation must cease until an attorney is present." *State v. Coleman,* 12th Dist. Butler CA2001-10-241, 2002 WL 745322, *3, citing *Miranda* at 474. "An accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484-485, 101 S.Ct. 1880 (1981).[7]

---

6. {¶ a} At the motion to suppress hearing, Smart testified as follows:

> {¶ b} [I]t would have been at Fudge's Wrecker Service, I believe. I did Mirandize him. * * *

> {¶ c} I Mirandized him. He advised he had understood his rights. I asked him about his brother and he advised at that point he wanted to speak with an attorney. He never made any incriminating statements to me, other than statements about where he's coming and where he's going, the initial stuff."

{¶ d} At trial, Smart testified that he *Mirandized* appellant "at the scene, the initial traffic stop scene" but continued to speak with appellant "until the moment he decided to ask for an attorney deeper into the stop."

7. The state argues in its brief that appellant did not invoke his right to an attorney until he was being interviewed by Beatty. While appellant clearly invoked his *Miranda* rights during his interview with Beatty, stating, "I want to exercise my rights," Smart's testimony at both the motion to suppress hearing and at trial indicates appellant exercised his right to an attorney earlier during law enforcement's investigation. A determination as to whether appellant relinquished his right to an attorney prior to speaking with Beatty is essential to a determination of whether appellant's statements to Beatty are admissible evidence.

**{¶ 62}** Based on the record before us, we find that trial counsel was deficient for not seeking to suppress appellant's statements to Beatty. Given Smart's testimony that appellant had earlier invoked his right to counsel during law enforcement's investigation, there is a basis for suppression of appellant's statements to Beatty. *See id.* Counsel's failure to seek exclusion of appellant's statements to Beatty precluded appellant from asserting violations of his constitutional rights. *See, e.g., State v. Scott*, 12th Dist. Warren No. CA2005-12-134, 2007-Ohio-1094. Under the facts of this case, we cannot say that defense counsel could have determined that his trial strategy was best served by not filing a motion to suppress appellant's statements to Beatty. *See id.* at ¶ 18. We therefore find that trial counsel's performance was deficient for not seeking suppression of these statements.

**{¶ 63}** We further find that appellant was prejudiced as a result of trial counsel's error, as there is a reasonable probability that had counsel sought suppression of appellant's statements to Beatty, the result of the trial would have been different. The state heavily relied on appellant's statements to Beatty in proving that he "knowingly possessed" the marijuana, pointing out appellant's inconsistent statements to law enforcement and his acknowledgement to Beatty that he "knew" he was "in trouble." During closing arguments, the prosecutor stated the following:

> [Prosecutor]: Then when he's interviewed by Penny Beatty, he says he's going by his brother's. He knows nothing about this. He says my brother knows nothing about this. Well, if - - you can't know if somebody else knows or doesn't know unless you do.
>
> He says he's going to swap it out. He's dropping it off at a farm. He mentions nothing about a tractor pull or a sled to Penny Beatty at all. Then he says his brother works as a machinist. Now he's not the owner of an excavating company anymore, apparently. He says a farmer is going to try to sell it for him.
>
> Why is all this stuff important? It's important because the truth does not change. The truth does not change every time somebody asks you a question. You only need to make up

things as you go along when you can't remember the lie you told
10 minutes ago because you're nervous, you're scared, and you,
you're all of those things because you know what you're hauling
down the highway.

The jury also appeared to rely on appellant's statements to Beatty in finding appellant guilty, as the jury specifically requested it be permitted to rehear the audio recording of appellant's interview with Beatty during its deliberations.

**{¶ 64}** Accordingly, given the facts of this case, we find that appellant has demonstrated his trial counsel's deficient performance was prejudicial. We therefore sustain that portion of appellant's second assignment of error alleging ineffective assistance of counsel. Appellant's convictions are vacated and this matter remanded for further proceedings according to law and consistent with this opinion. *See Scott*, 2007-Ohio-1094 at ¶ 30. On remand, the trial court is instructed to determine the admissibility of appellant's statements to Beatty in light of appellant's possible invocation of his right to remain silent (see above) as well as his invocation of his right to counsel. The court may receive additional evidence as needed to resolve whether appellant's statements to Beatty should be suppressed.

**{¶ 65}** Assignment of Error No. 3:

**{¶ 66}** THE ADMISSION OF TESTIMONY REGARDING DEFENDANT-APPELLANT'S PRE-ARREST AND POST-ARREST SILENCE AND THE PROSECUTOR'S CLOSING REMARKS VIOLATED HIS PRIVILEGE AGAINST SELF-INCRIMINATION AND RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**{¶ 67}** Assignment of Error No. 4:

**{¶ 68}** THE COMBINED EFFECT OF DEFENSE COUNSEL'S MULTIPLE INSTANCES OF DEFICIENT PERFORMANCE DEPRIVED DEFENDANT-APPELLANT OF

HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 69} Assignment of Error No. 5:

{¶ 70} THE TRIAL COURT'S DECISION TO FORFEIT DEFENDANT-APPELLANT'S CASH AND TRAILER IS AGAINST THE WEIGHT OF THE EVIDENCE AND IS CONTRARY TO LAW.

{¶ 71} In his remaining assignments of error, appellant raises issues relating to the admission of evidence at trial, errors his attorney allegedly committed in rendering his defense, and errors the trial court allegedly made in determining his trailer and the $5,699 in cash he was carrying were subject to forfeiture. Based on our resolution of appellant's second assignment of error, we need not address appellant's third, fourth, and fifth assignments of error. *See* App.R. 12(A)(1)(c); *Scott*, 2007-Ohio-1094 at ¶ 29.

{¶ 72} The judgment is affirmed in part and reversed in part, appellant's convictions vacated, and the matter remanded for further proceedings according to law and consistent with this opinion.

M. POWELL, P.J., and PIPER, J., concur.